UNITED STATES STEEL CORPORATION *v.* DYKES.

[No. 29,733. Filed November 20, 1958.]

*Stevenson, Conaghan, Velde & Hackbert, Harlan L. Hackbert* (of counsel), of Chicago, Illinois, *White, Raub & Forrey,* and *George C. Forrey III* (of counsel), all of Indianapolis, for appellant.

*J. M. Ruberto,* of Gary, for appellee.

BOBBITT, C. J.—This case comes to us on petition to transfer from the Appellate Court under Acts 1933, ch. 151, §1, p. 800, being §4-215, Burns' 1946 Replacement. See, *United States Steel Corporation* v. *Dykes* (1958), 148 N. E. 2d 844, for opinion of the Appellate Court.

This is an appeal from an award of the Industrial Board (one member dissenting) awarding appellee full death benefits under the Indiana Workmen's Compen-

sation Act, Acts 1929, ch. 172, §1, p. 536, being §40-1201, *et seq.* Burns' 1952 Replacement.

Appellee's deceased husband was employed as a "grinder" in appellant's steel mill in Gary, Indiana. During working hours, on September 7, 1954, he suffered a fatal heart attack.

The Board, among other things, found that on the 7th day of September, 1954, one John Dykes, plaintiff's decedent, was in the employ of the defendant, at an average weekly wage of $86.50; that on said date he sustained personal injury, by reason of an accident, arising out of and in the course of his employment with the defendant; that the said accidental injury consisted of exertion, which precipitated a coronary occlusion, resulting in his death on said date.

The sole error assigned is that the award of the Industrial Board is contrary to law.

An examination of the record to ascertain whether the evidence is sufficient to sustain the award discloses the following: The decedent had been employed on the same job as a "grinder" for "eight or nine" years. He was about fifty-five years of age, was well developed physically, and weighed 160 pounds at the time of his death.

The work of a grinder consists of taking defects such as slivers, seams, cracks and faults out of steel. This is done by a machine known as a grinder and shaped like a rolling pin. It is approximately 22½ inches long with an emery wheel, 6 to 6½ inches in diameter. The weight of the grinder was estimated by various witnesses at 12 to 35 pounds, and it is powered by electric motors.

The operator is required to stand while performing his duties. The steel bars upon which he works are placed on a supporting rack about waist high to the

operator. In order to grind the steel he is required to hold the grinder in such a manner that the emery wheel is held against the steel bar with pressure sufficient to grind out the defects. This operation causes some vibration in the operator's arms and the upper part of his body. As he moves from one defect to another the operator must lift the grinder each time the height of about two inches. The job is heavy physical labor which requires lifting, standing and walking during the regular work period.

On the morning of the decedent's fatal heart attack he appeared jolly and gave no indication of any mental or physical disturbance.

He worked until about 10:45, when he left his job and went to the "stock shearer shanty." About five or ten minutes later another worker came over to the inspector who had relieved the decedent and told him that Dykes (the decedent) was sick and lying on the floor in Bay 2. Another worker who was stationed about 35 or 40 feet from the decedent testified, as a witness for the petitioner-appellee, that he observed the decedent returning from the water fountain and when he got about halfway across Bay 2 he was staggering and "had both hands up against his chest." Seeing that he was "going to fall" the worker ran to him and eased him down to the floor. He then called for the ambulance but Dykes was dead when it arrived. The place where decedent fell in Bay 2 was about 75 feet from his station where he worked.

On the morning when decedent suffered the fatal heart attack he was on his regular job doing the same type of work in the same manner as he had been doing for more than eight years. However, the undisputed evidence is that the work he was doing on that particular day was "slowed" and less than usual.

Dr. Jerome M. Korn, Coroner's physician, who performed a post-mortem on decedent, testified, as a witness for petitioner-appellee, on direct examination, in pertinent part, as follows:

"Q. And what did you observe about the coronary vessels?

"A. They were the site of the disease—arteriosclerosis.

"Q. A-ha; and, what else did you observe about that with reference to being narrow or otherwise?

"A. Markedly thickened. The lumen was markedly narrowed; there were plaques of atheromatosis—tissue which is small fatty tissue.

"Q. What are plaques?

"A. Plaques are made up of fatty material deposited in the lining of the blood vessels, that are at the site of such disease.

"Q. And from your observation of the coronary vessels, which you describe as being diseased, could you tell they were of long standing?

"A. Yes, evidentally they were.

"Q. And when you observed this sclerotic condition tell us what you saw?

"A. The presence of sclerosis in the blood vessels indicating the presence of those plaques—the loss of elasticity, and narrowing of the channel through which the blood flows."

On cross-examination Dr. Korn testified, in pertinent part, as follows:

"Q. In which coronary vessels did you find arteriosclerosis?

"A. The sclerosis was marked in both vessels, and is higher in the posterior coronary vessel, and I usually listed which was, but I did not here. I can't recall it but both were quite diseased, but usually we can tell which has been involved.

"Q. Do you recall which was involved here?

"A. They both were quite sclerotic—described as such.

"Q. Did you find these plaques in both coronary arteries?

"A. And in the aorta also.

. . . . .

"Q. Now, you say you observed no blood clot?

"A. Correct.

. . . . .

"Q. Did you find any evidence in his heart of any plaque had broken off from the coronary wall?

"A. I did not.

"Q. Did you see any plaques that were loosened in a way that would cause you to believe they might have been sucked or swung out and invaded the artery?

"A. Some were quite prominent—that might have occurred.

"Q. You mean the deposit that had created those plaques had been there over a considerable period of time, do you not?

"A. Yes, sir.

"Q. Did you find any evidence of sudden damage or change in the heart structure?

"A. I did not.

. . . . .

"Q. Was your examination confined exclusively to determine that there was an infraction?

"A. Yes, sir.

"Q. Did you find one?

"A. I did not.

"Q. Any scars on the heart?

"A. Yes.

. . . . .

"Q. What, in your opinion, caused the death?

"A. Coronary occlusion, myocardium failure, coronary heart disease. My anatomical diagnosis was acute coronary condition.

. . . . .

"Q. What you found in your post mortem exam-

ination was a generalized narrowing of the coronary vessels?

"A. Thickening and narrowing and the sclerotic condition, that would be fair to say.

"Q. That condition was one developing over a long period of time?

"A. Correct.

"Q. That is common in the normal progress of that condition and ultimately result in the man's heart failure and death—immediate death?

"A. Yes, sir.

"Q. And, that's true in your experience and medical knowledge, Doctor, irrespective of the activity in which the man is engaged at the time the fatal attack occurs?

"A. What do you mean?

"Q. Let me put it this way: Without regard to the patients you may have performed post mortem examinations on—you do know that as a matter of your medical knowledge?

"A. Yes.

"Q. Then, such condition as you found on this post mortem strikes individuals at all hours of the day?

"A. That's right.

"Q. And night. And occurs regardless of the activity in which they are engaged?

"A. Correct."

Based upon a set of facts, as stated in a hypothetical question, and propounded by the attorney for appellee (most of this question was withdrawn) Dr. George Lewis, a witness for plaintiff-appellee, testified on direct examination, in part, as follows:

"A. . . . On the day of his death the vessel may not have carried enough blood and when he worked this work put a load on a diseased heart which the heart could not carry and the heart just stopped beating, couldn't get enough or sufficient nutrition and oxygen.

My opinion is that he died of acute coronary insufficiency which was aggravated and precipitated by his work operation. Is that what you want?"

On cross-examination Dr. Lewis testified, in pertinent part, as follows:

"Q. Doctor, it's your theory that the exertion of his work placed a demand on his heart that the blood supply to the heart was not capable to meet?

"A. That's right.

. . . . .

"Q. Yes; I think you say on the direct examination that this man's condition after autopsy was a pre-existing heart disease for considerable time?

"A. Yes.

"Q. And it will be normally expected that condition will progress ultimately where the heart supply is insufficient and the man suffers a severe or fatal coronary attack?

"A. Yes, sir.

"Q. I think you said it was your opinion this man's heart condition notwithstanding the fact that it was diseased, may have been supplying his heart with enough blood to carry on until that day, is that right?

"A. Yes, sir.

"Q. And on that day when he approached the danger point or point of progression, to the point of insufficiency, then whatever activity that man is engaged in on that day—which proves to be more than his heart will supply, enough blood, it is going to result in the onset of a coronary attack, isn't it?

"A. Yes, sir.

. . . . .

"Q. So it's not just a question of having been engaged in exertion to a greater or lesser degree, but a question of how far the deterioration of the heart has progressed?

"A. That's one factor. The other is what work he did from the time he started at eight in the morning until nobody seems to know when he stopped—even a half hour of work could have acted as over-exertion.

"Q. And even with no work at all, if he had rested, if he had reached, I mean the point in the deterioration of his heart where it wasn't going to be able to supply the normal, daily need of blood, that he might have had the accident?

"A. That's right."

Dr. Peter Stecy, also a witness for the plaintiff-appellee, testified, on direct examination, substantially as did Dr. Lewis, and in answer to the same hypothetical question, said:

"A. Yes my opinion is this: That the work engaged in by the decedent aggravated the pre-existing condition known as coronary artery disease and precipitated his death."

We recognize the well-established rule that the Industrial Board is the trier of the facts and its decision thereon is binding upon this court if it is sustained by competent evidence. *Clark* v. *Hughey* (1954), 233 Ind. 134, 138, 117 N. E. 2d 360.

The question which we must then determine is whether or not the evidence in the record here is sufficient to sustain the finding of the Board, i.e., Is the evidence competent to show that decedent died as the result of an accident arising out of and in the course of his employment or that there was a causal connection between his heart attack and his employment?

The causal question here is: Was the inability of decedent's heart to meet the demands, i.e., the "coronary insufficiency," caused by a change, i.e., an increase in the work load beyond the heart's ability to function, or by a decrease in the .

heart's ability to meet an unchanged demand. The "cause" is that which has changed, not that which remains constant.

The uncontradicted evidence here is that decedent's heart was steadily and surely losing its functional ability, but there is no evidence whatever of any increase in the work load or of any extra exertion. In fact, the unchallenged evidence is that the work load was lighter on the morning of the fatal attack.

The autopsy herein disclosed no rupture or detached plaques or clots in the coronary blood vessels. The myocardium was dark in color which indicates that the heart failed because of unoxygenated blood due to a long-standing coronary disease. The autopsy revealed no evidence of the sudden worsening or aggravation of that disease.

The only evidence that there was an aggravation of a pre-existing disease is the opinion of Dr. Lewis and Dr. Stecy expressed in answer to a hypothetical question, heretofore mentioned, the greater part of which was withdrawn from their consideration and not restated.

It appears from the testimony of Dr. Lewis and Dr. Stecy that the theory upon which appellee has based her case is that decedent's heart was gradually deteriorating to the point where it could not meet the demand made upon it by his normal and usual activities; and since the activity in which he was engaged on the morning of his fatal attack was his usual and customary work, then the work caused the coronary insufficiency.

This theory is further supported by a statement of appellee which appears in the argument section of her brief, as follows:

"From the above positive testimony,[1] the Board

1. The testimony to which reference is made was by defendant's witness, Jack Plukas, and is as follows:

had a right to find that *the decedent was working that morning and while working died.*"

The cases of *Slaubaugh* v. *Vore* (1953), 123 Ind. App. 497, 110 N. E. 2d 299; and *U. S. Steel Corp.* v. *Douglas et al.* (1955), 125 Ind. App. 212, 123 N. E. 2d 899, and cases therein cited are relied upon to support appellee's theory.

While this court denied transfer in the Slaubaugh Case it does not necessarily follow that we ■ approved either the result or the reasoning by which the result was reached.

"When a transfer is denied, it does not necessarily follow that the result, or the reasoning by which the result is reached by the Appellate Court, is thereby approved by this court, since the petition to transfer may not present such matters for our determination." *Citizens Independent Tel. Co.* v. *Davis* (1951), 229 Ind. 217, 218, 97 N. E. 2d 490.

The Slaubaugh Case is not controlling here. Neither is it persuasive because it is clearly distinguishable from the case at bar. In that case the Industrial Board found that the accident (attack) was caused by *extreme exertion,* and such finding is supported by competent evidence.

There is neither contention nor evidence here that the decedent Dykes, on the morning of his death, was engaged in anything except his usual work, which he was performing in the usual and customary manner. However, there is evidence, to which reference has already been made, that the decedent's work was, on

---

"Q. Did you know John Dykes, or had you worked with him on that job?
"A. Yes, sir.
"Q. Were you working with him the morning he died?
"A. Yes, sir."

this particular morning, lighter than usual. The Industrial Board found no extreme or excessive exertion beyond that imposed by the usual nature of the activities necessary to the proper performance of the work which he had been doing for more than eight years.

There was no petition to transfer filed in the case of *U. S. Steel Corp.* v. *Douglas et al., supra* (1955), 125 Ind. App. 212, 123 N. E. 2d 899. While this court is not bound by the ruling and reasoning of the Appellate Court in that case, that court there pointed out that there was evidence from which the Board could draw the reasonable inference that the decedent, on that occasion, was, in fact, moving faster and with more sustained continuity than usual, "that decedent's exertion in the doing of his work on that final morning of his earthly life was, in fact, greater than usual" and that the Board could reasonably "conclude that the plaques which broke loose and floated, as a foreign body, in the blood stream, clogging the passage of the blood to the heart, would occasion a lesion in the arterial vessels."

From this statement it appears that in the Douglas Case there was evidence that the decedent's pre-existing heart trouble was aggravated by an *unusual exertion* occasioned by an increased work load on the morning of his fatal heart attack. Even if the Douglas Case were controlling here, it is clearly distinguishable from the case at bar because there is no evidence in this record such as is present in that case.

"... compensation has been allowed for the death of a workman caused by the rupture of an already degenerated heart after a blow on the head from a pneumatic hammer. It has been allowed for death by rupture of a weakened aorta while the workman was pushing a heavy coal car. It has been allowed where death resulted from heart disease found to have been aggravated by the inhala-

tion of smoke-laden air in a coal mine. It has been allowed where death from heart failure was found to be the result of an electric shock suffered in the employment." Small's Workmen's Compensation Law of Indiana, §6.20, p. 151.

In each of the above instances the fatal heart attack was preceded by some type of untoward or unexpected incident, or there was evidence of the aggravation of a previously deteriorated heart or blood vessel.[2] No such incident is shown by the evidence in the record here.

We recognize the well-established rule that this court will not disturb a finding of fact made by the Industrial Board unless the evidence, with all inferences reasonably deducible therefrom, is of such conclusive nature as to force a contrary conclusion. *Heflin* v. *Red Front Cash & Carry Stores, Inc.* (1948), 225 Ind. 517, 521, 75 N. E. 2d 662.

Under the evidence in this case decedent's fatal heart attack might have happened while he was working, driving his car, sitting or even sleeping. It happened while he was working at his usual occupation; and in such event it could be said that his heart failed because it could not handle the load then demanded of it. In our opinion it was not the intention of the Legislature that such happening be considered a "death by accident arising out of and in the course of the employment." Acts 1929, ch. 172, as amended, being §40-1202, Burns' 1952 Replacement.

2.   See: *Haskell & Barker Car Co.* v. *Brown, et al.* (1918), 67 Ind. App. 178, 117 N. E. 555; *Indian Creek Coal etc. Co.* v. *Calvert, et al.* (1918), 68 Ind. App. 474, 119 N. E. 519, 120 N. E. 709; *Utilities Coal Co.* v. *Herr, et al.* (1921), 76 Ind. App. 312, 132 N. E. 262; *Mansfield Eng. Co.* v. *Winkle* (1921), 77 Ind. App. 237, 133 N. E. 390; *Carnegie-Illinois Steel Corp.* v. *Flack* (1946), 116 Ind. App. 427, 64 N. E. 2d 167; *Youngstown Sheet & Tube Co., et al.* v. *Tucak, et al.* (1946), 116 Ind. App. 612, 66 N. E. 2d 619; *Rauh & Sons Fertilizer Co.* v. *Adkins, et al.* (1956), 126 Ind. App. 251, 129 N. E. 2d 358.

Neither is it what the courts had in mind when they said that if an accident aggravates a pre-existing condition the resulting harm is compensable. *Heflin* v. *Red Front Cash & Carry Stores, Inc., supra* (1948), 225 Ind. 517, 521, 522, 75 N. E. 2d 662.

The court of appeals of New York in considering a similar situation as that presented by the record here, in *Burris* v. *Lewis* (1957), 2 N. Y. 2d 323, 160 N. Y. S. 2d 853, 141 N. E. 2d 424, at page 426, succinctly stated as follows:

> "Not only is there no evidence of fresh heart lesion, but also there is no medical opinion of any overexertion . . . .
>
> "But where, as here, a heart has deteriorated so that any exertion becomes an overexertion, where the mere circumstance that the employee was engaged in some kind of physical labor is what impels the doctor to testify that his work caused his death, we would have reached a point, if this award were to be upheld, where all that is necessary to sustain an award is that the employee shall have died of heart disease. 'Insofar as it caused this result,' quoting from *Detenbeck* v. *General Motors Corp.*, 309 N. Y. 558, 561, 132 N. E. 2d 840, 842, 'the work in which he was engaged simply amounted to the ordinary wear and tear of life impinging on the infirmity' with which he had been previously afflicted.[3]

3. The medical theory of a situation such as that presented by the record here is ably stated by Dr. Alan R. Moritz in an article "Coronary Thrombosis," J.A.M.A. Vol. 156, No. 14, pages 1306-1309, reprinted in the 1955 Medical Trial Technique Quarterly, pages 67 to 77, at page 74, as follows:

"Frequently it is difficult or impossible to evaluate the significance of the particular episode of stress or injury that the disabled person stipulates (claims) as the precipitating cause of his disability. If the event stipulated is clearly unusual and if it was followed immediately by heart (cardiac) failure, the relationship may be reasonably clear. Often the event stipulated is not sufficiently unusual to distinguish it from other nonoccupational stresses that may have occurred about the same time. Thus, it may be alleged that coronary insufficiency or heart failure was precipitated by lifting a 40 lb. box from an overhead shelf. Such an exertion may have been no greater than that of

It seems to us that the only conclusion which reasonable men could reach from the foregoing evidence, with all the inferences reasonably deducible therefrom, is that the decedent herein was afflicted with a diseased heart and coronary system, which had deteriorated to the point where it could no longer stand the load imposed upon it by his regular and usual work, and that his death resulted solely from coronary arteriosclerosis progressing gradually to the point where it caused his death.

The mere showing that he was performing his usual routine everyday task when he suffered a heart attack does not establish a right to workmen's compensation because there was no event or happening beyond the mere employment itself.

For the foregoing reasons the award of the Industrial Board is contrary to law and must be reversed.

The judgment of the Industrial Board is reversed with instructions to set aside its award and proceed further in accordance with the views herein expressed.

Achor, Arterburn and Emmert, JJ., concur.

Landis, J., concurs in result.

NOTE.—Reported in 154 N. E. 2d 111.

sneezing or straining at stool, either or both events may have had the same relationship to the onset of heart (cardiac) disability as did the stress of lifting the box. In circumstances of this type no one can assert with propriety that any one of these episodes of stress was more likely than any other to have provided the excess work load that caused the diseased heart to fail."