ARFORD ET AL. *v.* STATE OF INDIANA.

[No. 19,197.  Filed March 4, 1959.]

*Franklyn George,* of New Castle, for appellants.

*Edwin K. Steers,* Attorney General, and *Paul H. Frazier,* Deputy Attorney General, for appellee.

KELLEY, J.—Appellants were sole dependents of Roxford Fleming Arford, now deceased. They filed application, as dependents, for compensation benefits on the alleged ground that said decedent died on No-

vember 19, 1956, as a result of personal injuries received by him by reason of an accident arising out of and in the course of his employment by appellee. Said decedent was employed by appellee as a dairyman at the New Castle State Hospital, located at New Castle, Indiana, formerly known as the Indiana Village for Epileptics.

The Full Board found that decedent died as a result of a heart attack that had no relation to his work and did not arise out of and in the course of his employment with appellee, and awarded that appellants take nothing by reason of their application. From said award appellants appeal, assigning that the same is contrary to law.

It appears from the record that decedent had been in the employ of appellee a little over three years prior to November 19, 1956. On said date he served appellee in the capacity of head dairyman of the said New Castle State Hospital. Generally, his duties consisted of keeping records; rounding up and feeding the cattle, helping to deliver the calves, and administering to the sick cattle; helping to milk the cows with mechanical milkers; cleaning the holding tanks; driving a truck for the delivery of milk by a patient to the kitchens and cottages of employees on the farm; and, in general, doing the incidental and necessary work in connection with his position.

On the aforesaid date, said decedent was about 40 years of age and on said date and for some years prior thereto he was afflicted with a rheumatic heart disease. On September 13, 1956, decedent became ill at his home located on the premises of said institution and was attended by one Dr. John E. Fisher, who served on a consulting basis to said State Hospital. At that time the physician was not sure whether decedent had an actual thrombosis or a coronary occlusion. The next

day decedent was sent to a hospital where it was determined that he had a rheumatic heart disease involving the aortic valve, commonly called "angina."

It was found that decedent's heart was enlarged and he remained in the hospital until September 25, 1956. He then returned home and convalesced for about two weeks. His condition was thereafter observed by said physician approximately every two weeks. Decedent was permitted to return to his work in a supervisory capacity and advised to do no physical work at the time. In the ensuing time, after decedent was "rechecked and everything seemed pretty well stabilized" he was advised he could go back to work for an hour or two daily in a supervisory capacity and was to do no physical work of any kind.

On November 19, 1956, decedent went to work at his usual time of 3:00 A. M. On that day there were some sixty cows herded for milking. Usually five to seven men looked after the milking of that number of cows. However, on the day aforesaid, one of the men began his vacation, thereby reducing the usual number of milkers. Decedent "pitched in" and helped to do some of the work.

The cows are milked by a mechanical milking apparatus weighing about five pounds. Decedent, on the morning aforesaid, stood in a pit approximately five or six feet in depth, washed the udders and fitted the milking apparatus on about twenty-five cows, after the apparatus had been let down, washed and sterilized by him. He also washed ten of the containers. There were glass jars, weighing about ten pounds each, which were "hanging up" and these glass jars had to be fitted down so that the milking apparatus could be connected with it. Decedent lifted down about ten of these jars, then lifted them up about two or three feet while in a stand-

ing position, turned his body one-fourth to one-half way around to the side, his feet remaining stationary, and placed the jars on a scale about three feet away and then lifted them back again.

During the milking activity, one of the cows kicked decedent on "the side of the arm and along the side, just enough to scrape it with the foot, hit his arm and shoulder," and decedent rubbed his arm and applied external medication to it.

Decedent went home for breakfast at 7 o'clock A. M. He complained of being tired and not feeling well. He took two nitro-glycerin tablets and rested until 7:30 o'clock A. M. and drove back to the barn. The milk was then put on the truck by one of the patients and decedent drove the truck, accompanied by one of the patients, at about 7:40 o'clock A. M., to one of the farm cottages and "Just as we stopped at the farm cottage he (decedent) stiffened out just straight right there underneath the steering wheel." Decedent was lifeless at the steering wheel when the doctor arrived.

Said Dr. Fisher was called by the appellants and was the only medical evidence introduced. By his testimony the appellants apparently sought to establish a causal connection between decedent's employment and his fatal heart attack. Other than the kick by the cow, there is no evidence of an accident of a traumatic nature. As to the latter, the physician said: "I do not think I could think of a definite relationship between a blow on the arm of being directly responsible for his death. . . . I do not think it probably had anything to do with it."

It appears in evidence that the decedent had a pre-existing heart disease, a rheumatic heart disease for some time prior to September 14, 1956. The duration of the pre-existence of the heart disease is unreflected

by the evidence. Appellants contend that decedent's "death was due to aggravation of a previous heart condition, caused by exertion and strain arising out of and in connection with his duties as an employee" of appellee. The burden of proof to sustain the facts upon which said contention is predicated rests upon appellants.

The record indicates that there was no autopsy or post-mortem examination of the deceased. The evidence of the physician, said Dr. Fisher, as to any connection between the said work performed by decedent and his fatal heart attack was given mainly in the form of opinions called forth by hypothetical questions incorporating assumed facts. For clarity and proper exposition we make reference to the various opinions expressed by him.

Upon the assumption that decedent arose at three o'clock in the morning, went to the barn, milked the cows, returned home, ate his breakfast, went back to the barn, got in the truck and started driving it, the physician was asked whether or not, in his opinion, that sort of physical exercise might have brought on an attack. He answered:

> "I think it is pretty obvious that this man when he was at bed rest had an attack. *I do not feel that the amount of work,* whatever he did that morning, *contributed appreciably to his attack* that morning. I feel *it was going to happen even at rest sometime.*"
>
> . . . . .
>
> "Q. Would you say, . . . assuming he had done some physical work such as milking, driving a truck, that that would be an excess amount of exercise for him with the condition of his heart at that time?"
>
> "A. *I don't think so* because the signs we were looking for would have been shortness of

breath, some signs of gradual failure, not sudden."

. . . . .

"Q. You said on direct examination that you did not feel that milking and driving a truck would be exertion which could be said to be excessive or could have been termed the cause of fatal coronary attack. Is that right, Doctor?"

"A. I said that *but I do not know whether any one can honestly answer that, I don't know,* with the exception *we do know that he had a severe pain while at bed rest."*

. . . . .

"Q. Doctor, assuming a man forty years of age of Mr. Arford's general physical make-up and condition had gotten out of bed as was his custom about three o'clock and gone to the barns where he was supervisor of the dairy and assume that he had done some work in the office there at the barn, and assume further that the milking, if any was done, was done by automatic milking machines and that he then returned to his home at about seven o'clock and then at about seven thirty had gotten in a truck and driven a distance of one or two miles, which took about ten minutes time and assume that this man was found in the truck, assume he had died in the truck from a coronary occlusion, do you have an opinion as to whether or not the work that he did that morning could have caused or contributed to the coronary occlusion?

"A. Well, I would like to say I think the patient must have been disregarding my advice somewhat by getting up - - -

"Q. Do you have an opinion? First answer that.

"A. I will have to say yes, *it could have,* because that is one of the reasons why I was limiting his activities. *I don't know whether it did* but it is my opinion it could have. *At the*

*same time he could have had one while he was resting."*

. . . . .

"Q. Can you explain, Doctor, how the exercise or work that Mr. Arford did that morning could have caused the thrombosis to form?

"A. . . . it is reasonable to assume when the heart is under some strain that if the blood demands of the heart muscle, which is a muscle, become excessive there is a greater demand for it which cannot be met, and whenever there is a lack of oxygen in these coronary vessels that can cause spasm which causes a narrowing, . . . whenever there is slowing of the blood in those small arteries there can be a clot formed. I am not making the statement that is what happened.

"Q. Do you feel that is what happened?

"A. I would have to say that if the milking, if he did milk that morning, if the milking exertion was going to cause it *I think it should have caused it at the time he was doing it* and *not later when he was sitting in his truck."*

. . . . .

Appellants rested their case and subsequently the testimony of a witness for appellee developed the fact that the decedent had been kicked by a cow. Thereupon, the physician was recalled and a long hypothetical question, assuming all the material facts in evidence including the age, heart condition, work and activities of decedent on the morning of November 19, 1956, and the fact that he was kicked by a cow, was put to the witness and he was asked if he could state with reasonable certainty whether the work and the injury decedent might have sustained from the kick of the cow "would have been of such a nature that it would have produced or caused the death" of decedent. The answer, further questions and answers were as follows:

"A. You would like me to state whether I think what he did that morning might have contributed to

"Q. Yes.

"A. I think I would have to answer 'Yes.' I think *it could have been* a contributing factor *but I can't say absolutely certain that it was.*

"Q. There was no post mortem and it would have to be a conclusion on your part?

"A. From the fact we were limiting his activities it would seem reasonable the fact that he did more than he had been advised to, that his exertion *might or could have been* a contributing factor *but I can't say for certain that it was.*

"Q. No clinical way of telling that, is there?

"A. No.

"Q. Only through post mortem. Is that right?

"A. That even might not have given you the answer.

. . . . .

"Q. . . . do you feel that the kick or blow (by the cow) was of any significance in causing the heart attack?

"A. I think in answering Mr. George's question I said all the events leading up to his death *conceivably could have been* contributory causes. I do not think I could think of a definite relationship between a blow on the arm of being directly responsible for his death.

"Q. Then it is your opinion that a blow to the arm . . . could not have any real importance in trying to ascertain the cause of the fatal heart attack?

"A. I think that is correct. *I do not think it probably had anything to do with it.*

"Q. When you say, Doctor, that the work could have been a contributing factor, are there many other factors that you could enumerate which would also have to be considered in trying to determine the cause of this fatal heart attack?

"A. Definitely.
"Q. . . . In other words, could he just as easily have had this heart attack as you have said before, while he was sitting in a rocking chair, watching television or many other activities?
"A. I believe I have to say that."

. . . . .

Finally, another hypothetical question, incorporating practically the same general facts as the previous questions, was put to the doctor. He answered:

"A. If I can elaborate a little on how I answered your hypothetical question. You gave me the facts. I said that the exertion he had that morning while milking could have been a contributing factor. I cannot state with absolute certainty it was. In my opinion *it is possible but not probable* that it did."

We have belabored this opinion with a greater extension of the medical evidence than seems essential because of appellant's rigid insistence that such evidence sustains their burden of establishing the causal connection between decedent's employment and his final heart attack, and, thus, "there was no basis, no evidence whatsoever, for the finding of an award" for the appellee.

Appellants vigorously argue that the evidence shows increased exertion by decedent in the doing of his work, as a result of which his damaged heart gave way; and, therefore, there was an "aggravation of a previous heart condition" sufficient to cause his death. The difficulty of appellants' position lies in the inconclusiveness of the evidence on the issue of whether the asserted increased efforts of decedent caused or led to or precipitated the coronary thrombosis which resulted in his death. In no part of the physician's testimony does he unqualifiedly state the affirmative of such issue. The

record reflects that the doctor who testified for appellants strove earnestly under the circumstances to give impartial, careful and well considered opinions as to the matter. Several times he said that definite answers could not be honestly given. Several times, also, he alluded to his belief that "it was going to happen even at rest sometime"; and he affirmed that decedent could just as easily have had the heart attack while "sitting in a rocking chair, watching television or many other activities." On many occasions, he stated that he did not know whether the exertion caused or contributed to the coronary occlusion. Repeatedly, he said that "it could have" or it "might have" and sometimes qualified these statements with the explanation that decedent "could have had one while he was resting."

If the finding and award of the Board had favored appellants, it is possible that it could be said, on appeal, that there was some evidence to sustain such a finding. In cases where the Board found for the claimant, it has been held, on appeal by the employer from such award, that the opinions of medical experts using such words as "might", "could", "likely", "possible", "may have" in testifying concerning the causal connection between accident and disability, if coupled with other credible evidence of a non-medical character, is substantial evidence and sufficient to sustain the award. *Magazine* v. *Shull et al.* (1945), 116 Ind. App. 79, 60 N. E. 2d 611; *Blackfoot Coal & Land Corporation* v. *Cooper* (1950), 121 Ind. App. 313, 320, 321, 322, 323, 95 N. E. 2d 639. Where, however, as here, the award is negative to the claimants, the duty of the appellate tribunal is not to determine whether the evidence would have supported a finding and award for the appealing claimants, but to ascertain whether

there is some substantive evidence of probative value to support the award appealed from.

Here, the facts relating to the question of causation are undisputed. The enquiry now is whether such facts afford only a single inference or are conducive to different reasonable inferences. If the former, then the question is one of law, but if the latter, then there was a question of fact for the Board. To establish the chain of causation, it is requisite that the evidence in this case show that there was some unexpected injury, strain or over-exertion required or produced by decedent's employment, and that such unexpected injury, strain or over-exertion directly and proximately resulted in decedent's fatal heart attack. The pressing problem posed by appellants is whether the undisputed evidence of the medical expert allows, as appellants propose, but the one inference that decedent's fatal heart attack resulted directly and proximately from decedent's employment activity on the morning of November 19, 1956.

It seems clear that the testimony of Dr. Fisher does not lead to the single inference that decedent's work caused or was responsible for the heart failure sustained by him. The answers and opinions of the physician are equivocal and uncompelling. The testimony of the doctor that "I do not feel that the amount of work, whatever he did that morning, contributed appreciably to his attack that morning"; that "I think it should have caused it at the time he was doing it and not later when he was sitting in his truck"; that "it is possible but not probable that it did"; that "I don't know whether it did"; and that "I do not think it (the kick of the cow) probably had anything to do with it," was evidence of such substantive character as to war-

rant the Board to believe it and it was sufficient to sustain its finding and award against the appellants.

It is apparent that the medical testimony was not of such conclusive nature in favor of appellants on the issue of proximate cause that the Board could not draw reasonable inferences therefrom favorable to appellee and favorable to its finding of ultimate fact that the decedent "died as the result of a heart attack that had no relation to his work and did not arise out of and in the course of his employment . . ."

". . . In order to justify a reversal of the award in the instant case on the ground of insufficiency of the evidence to sustain the finding the evidence must so conclusively prove each of such ultimate facts that it can not be reasonably construed to give rise to inferences favorable to appellee as to any of such ultimate facts. . . . it was the duty of the Industrial Board to weigh the evidence and to determine which evidence was most worthy of belief and this court is not authorized upon appeal to weigh the evidence, and review the action of the Industrial Board in making such determination; . . .

". . . Our determination of this appeal is based upon the proposition that . . . the finding of such ultimate facts is within the province of the Industrial Board and when the Industrial Board has made a finding as to such ultimate facts its findings must be sustained by this court upon appeal if there is any reasonable evidence in the record to support it." *Lee* v. *Oliger* (1939), 107 Ind. App. 90, 21 N. E. 2d 65.

If it were necessary for us, in this case, to consider the question of the sufficiency of proof of the claimed unexpected exertion and strain which it is alleged was the "proximate cause of the death of the deceased," the recent decision of our Supreme Court in the case of *U. S. Steel Corp.* v. *Dykes* (1958), 238 Ind. 599,

154 N. E. 2d 111, would be of profound influence. The holding in that case will no doubt necessitate a thorough reappraisal of previous holdings on the question of the sufficiency of the evidence to sustain a claim of exertion or strain in the doing of the work of the employment occasioning aggravation of a perviously deteriorated heart or blood vessel and proximately resulting in or precipitating a fatal heart attack or deficiency. However, on the instant appeal we are not required to undertake such reappraisal.

Appellants have made assertions in their brief that decedent "was *directed* by appellee, *through its duly delegated agents,* to do certain physical labor in addition to his supervisory work" and that "when appellee *required* decedent to ignore such precautionary measures, and *compelled* him, or even permitted him to do physical labor, that would cause exertion or strain which precipitated a coronary occlusion, then appellee, . . ., must and should be held accountable for its acts." Earnest inquiry has failed to reveal to us any evidence that appellee or any of its agents "directed" or "required" or "compelled" the decedent to do any physical labor. Rather, the evidence is that decedent was advised to do "no physical work" of any kind.

The award appealed from is affirmed.

NOTE.—Reported in 156 N. E. 2d 401.