DROMPP ET AL. *v.* EAST ET AL.

[No. 19,579.   Filed December 5, 1961.   Rehearing denied December 28, 1961.  Transfer denied December 10, 1962.]

*Miller & Tolbert* and *Hanna & Small*, both of Logansport, for appellants.

*Edgar W. Bayliff*, and *Cook, Cook, Bayliff & Mahoney*, both of Kokomo, for appellees.

RYAN, C. J.—The appellees, as sole dependents of William A. East, now deceased, who was employed by appellants as a hod carrier, filed application to the Industrial Board for compensation benefits. The appellees in their application alleged that the decedent died on August 29, 1958, as a proximate result of personal injuries received by him on the same day by reason of an accident arising out of and in the course of his employment by appellants.

The Full Board in awarding compensation benefits to the appellees found that the decedent did, on August 29, 1958, sustain an accidental injury arising out of and in the course of his employment as a hod carrier and that as a result of such injury he died within the hour. The Board also found that decedent's death was precipitated by unusual exertion on the preceding day and day of death. From this award appellants appeal, assigning as error that the award is contrary to law.

It appears that the decedent was fifty-three (53) years of age, five feet ten inches tall, and weighed one hundred fifty (150) pounds. He was employed by the appellants as a hod carrier and had been employed in such position for at least three (3) years. His job consisted primarily of supplying and putting the mortar on the mortar boards, keeping the bricklayers

supplied with tile and any other materials they so needed on the particular job. The work was of a heavy nature. The particular job the decedent was working on when the alleged accident occurred on August 29, 1958, was the construction of the East Gate Shopping Center, Logansport, Indiana. The evidence reveals that the day prior to the alleged accident the deceased and his co-worker were involved in the lifting of coping stones which weighed approximately two hundred (200) pounds. The deceased and his co-worker would pick up each one of these stones from a pallet and then slide them on to the back end of a pick-up truck. They would then remove the stones from the truck, place them on an elevator, which in turn would take them to the top of the building. The day before the alleged injury the deceased and his co-worker had handled about fifty (50) of these stones in the manner described. On the day of the decedent's death, August 29, 1958, the decedent and his co-worker again lifted one of these stones in the same manner as previously described, and after putting the stone on the rear of the truck the decedent put his hand up over his left chest and said, "Damn, if I don't believe I have pleurisy this morning." The decedent went on about his regular routine duties after the above occurred, and shortly thereafter the decedent carried two eight-inch blocks (weighing approximately forty-three [43] pounds apiece) into a building. Approximately two minutes after the decedent entered the building with the two blocks, one of his fellow employees found Mr. East lying on the floor in a semi-conscious condition. The decedent died approximately five minutes thereafter.

The deposition of Dr. A. D. Dennison, Jr., who testified for the claimants, revealed:

"Q. What, in your opinion, was the cause of his death?

A. It is my belief that this man died a cardio-vascular death related to the increased exertion and that, in view of the facts presented, the most likely cause of death is acute coronary insufficiency.

Q. Will you explain, Doctor, what you mean by acute coronary insufficiency?

A. Acute coronary insufficiency in this situation means that the unusual exertion resulted in the diseased coronary vessel being unable to provide oxygenated blood for the heart muscle and this insufficient blood flow triggered off a 'mechanism death', as we now call it. A 'mechanism death' means that the heart either went into a standstill or went into an abnormal rhythm and subsequently stopped. To be more clear, the history is strongly suspicious of previous coronary artery disease. Previous exertional experiences caused discomfort in his chest and on one occasion fainting. On the morning of his demise, the unusual exertion of lifting a 200 to 250 lb. stone made him exclaim again about his chest and it would seem that this exertion made the heart demand more blood, but the rusty, narrowed coronaries couldn't provide this blood. The heart muscle wanted oxygenated blood and when it didn't get it, it became irritable, which is the mechanism of what happens to the heart when it has insufficient flow and an irritable, unoxygenated heart muscle dies, either through standstill or through an abnormal rhythm.

Q. What significance, if any, does the fact that the man continued working and carried these concrete blocks into the building, stacked them, and so forth, following the lifting of the coping stone and the complaint of pain in his chest as he did so?

A. As a cardiologist, I felt that after a ... warning his job necessitated his continuing this manual type of labor and he carried 72 lbs. weight and had to walk with it, which in-

volved the demands of the legs and arms for blood, plus the carrying the weight, and this seemed to be the . . . the final, cruel blow to his heart muscle begging for better blood supply. Now, Dr. Milton Halpern has shown that sudden death due to coronary artery dissease, at autopsy, usually reveals coronary sclerosis and the cause of death is coronary insufficiency at that time, often due to strenuous exertion, but occasionally some of them will actually show an occlusive, a fresh, occlusive episode, but the more dangerous thing to an individual with coronary sclerosis is the unusual exertion triggering off this insufficient flow at a time when the heart needs blood and it can't get it, because these rusty, inelastic vessels cannot dilate up and meet the need at that time.

Q. If the workman had not continued working after lifting the coping stone and complaining of pain, do you have an opinion as to what effect that would have had upon his dying or not dying?

A. I believe that there was a chance in this whole story to salvage his . . . his life, that having been given the initial warning of chest pain related to strenuous exertion, that if he had gone to rest, gotten to a doctor, or been put to bed and all of the classical measures of protection known to cardiologists provided him, that we might still have a . . . a live patient. The continued exertion seemed to be 'the straw that broke the camel's back' ".

Dr. Charles E. Test testified:

"A. Well—the symptoms which this man had during the months or year prior to his death suggests that the circulation to his heart muscles, which circulation is supplies by the coronary arteries was inadequate. On the basis of this and the events which immediately preceded his death, his symptoms at that time, I conclude that his heart failed, because the blood supply to the heart muscles

through the coronary arteries was insuffi-
cient these vessels having been narrowed or
occluded by the process of arteriosclerosis."

Dr. Richard M. Nay gave the following testimony:

"Q. What significance, if any, does the fact that
the decedent lifted a two hundred or two
hundred-fifty pound coping stone or carrying
a bucket of water, two at a time, or carrying
two eight inch concrete blocks of the weight
of approximately forty-three pounds each,
what significance, if any, do these facts have
upon the failure of the cardiovascular sys-
tem?

A. From the testimony which we have heard to-
day, I believe they were not—these facts
were not a factor in the death of Mr. East.

Q. What significance, if any, does the fact that
the decedent moved one hundred ninety-three
feet of coping stone, together with another
person, upon the day preceding his death,
what significance, if any, are these facts upon
your opinion?

A. Well—I believe this does have some signifi-
cance, in that on August 28th, the day pre-
ceding his death, that he was capable of
performing great physical work and the fact
that he died on the following day would sug-
gest to me that there had been a significant
change in his heart so that death occurred
even in the absence of great physical exer-
tion, such as he had performed the day pre-
vious."

Mr. Leon Sands, the co-worker of the deceased, testi-
fied as follows:

"Q. Do you recall the day before 'Bill' East's
death?

A. Yes Sir.

Q. What work were you doing on that day?

A. Putting in that stone mostly, setting the
coping stones up on the top of the building or
the exterior of the building.

Q. You were working with Mr. East?

A. I did.

Q. Describe to the Judge the work you did on this day before his death?

A. We had a half-ton pick-up truck, we nailed 2x10 planks so they protruded out the back end to give ample room to lay two of the four foot coping stones on, each one side by side, in other words lay them parallel like this (motioning with his hands) end to end, we put two in and went back over to the Elevator, set one off and on to the elevator put the elevator in motion and sent it to the top of the building.

Q. How much would these coping stones weigh, Mr. Sands, approximately?

A. Two hundred pounds, maybe a little more.

. . .

Q. My question is I meant on the following day, when did you go to work?

A. The same day Mr. East died?

Q. Yes?

A. 7:30 in the morning.

Q. Did you work together on that day?

A. Yes Sir.

Q. What did you do the first thing in the morning?

A. The first thing we done that morning was fix one batch of mortar, mixed it and put it up on the board on the top of the roof.

Q. Did Mr. East work with you mixing that mortar?

A. Yes Sir.

. . .

Q. How many stones had you moved the day of the decedent's death?

A. One.

Q. One coping stone, is that right?

A. Yes.

. . .

Q. That is part of your duties as a mason tender to move the equipment from the masons after

they complete their work and take it back to the ground?

A. Yes.

Q. In fact all the work was your routine, usual duties?

A. Yes Sir.

. . .

Q. In other words this was part of your duties as a mason tender, would be to move these blocks?

A. Yes Sir.

Q. What did you say the twelve inch blocks weighed?

A. This was in the neighborhood of 70 pounds.

. . .

Q. How would this days work compare with the previous days of work you did?

A. No different.

Q. Would you say it was a rather light or heavy days work?

A. Well—it would be a little heavier in the sense that we did that four foot coping stones they were larger and heavier.

Q. How did it compare with the previous day?

A. You mean the day—restate the question?

Q. The prior day, the day before?

A. The day we put all the coping stones up?

Q. Yes?

A. That was a rough day, that's the day I thought you had in mind.

Q. The day before was a heavy day?

A. Yes.

Q. How about the day of the decedent's death?

A. It had veen very light up to that point.

. . .

Q. Mr. Sands, how would you compare the day before his death, whether it was a typical day of work?

A. Well—it is a little harder from the stand-point the four foot blocks of coping stone are

considered heavier then it takes a little more energy, a little more of a dead lift.

Q. You lifted about fifty of those objects?

A. Yes.

Q. And Mr. East lifted about fifty?

A. Right

Q. Ordinarily you were accustomed to lifting heavy lifting as the 12 inch blocks?

A. Yes, the two of them at the time."

While we thus belabor the opinion with a great extension of the testimony adduced, we feel it is necessary to do so since the determination of a question of fact by the Industrial Board is conclusive if it is supported by any substantial evidence, including the reasonable inferences that may be drawn therefrom. *Stoner* v. *Howard Sober, Inc.* (1958), 128 Ind. App. 371, 149 N. E. 2d 121; *Jackson Trucking Co.* v. *Interstate M. F. System* (1952), 122 Ind. App. 546, 104 N. E. 2d 575.

The question which thus presents itself for determination is whether or not the evidence is competent to show the decedent died as the result of an accident arising out of and in the course of his employment, or that there was a causal connection between his heart attack and his employment.

The Supreme Court stated the rule in *U. S. Steel Corp.* v. *Dykes* (1958), 238 Ind. 599, 154 N. E. 2d 111, 238 Ind. p. 607, 154 N. E. 2d p. 116, thusly:

"Was the inability of decedent's heart to meet the demands, i.e., the 'coronary insufficiency,' caused by a change, i.e., an increase in the work load beyond the heart's ability to function, or by a decrease in the heart's ability to meet an unchanged demand. The 'cause' is that which has changed, not that which remains constant."

As we stated in *Arford* v. *State* (1959), 129 Ind. App. 312, 156 N. E. 2d 401, 129 Ind. App. p. 325, 156 N. E. 2d p. 407:

"The holding in that case [*U. S. Steel Corp.* v. *Dykes, supra*] will no doubt necessitate a thorough reappraisal of previous holdings on the question of the sufficiency of the evidence to sustain a claim of exertion or strain in the doing of the work of the employment occasioning aggravation of a previously deteriorated heart or blood vessel and proximately resulting in or precipitating a fatal heart attack or deficiency."

We can thus infer from the evidence that the day prior to the decedent's death he engaged in exertion which was heavier than normally was required on his job. Evidence which further tends to establish this fact is that given by Dr. Dennison in his deposition, as follows:

"Acute coronary insufficiency in this situation means that the the unusual exertion resulted in the diseased coronary vessel being unable to provide oxygenated blood for the heart muscle ... On the morning of his demise, the unusual exertion of lifting a 200 to 250 lb. stone made him exclaim again about his chest and it would seem that this exertion made the heart demand more blood, but the rusty, narrowed coronaries couldn't provide this blood. . . ."

While there was thus some variance between the medical testimony, the fact that there is some contradiction does not clothe us with the function of becoming the trier of the facts. The evidence given by each of the witnesses was of probative value and the weight of the evidence is for the determination of the Board as was the prerogative to believe or disbelieve the statements of the witnesses. *Welton* v. *State Highway Commission* (1960), 131

Ind. App. 291, 170 N. E. 2d 450. The burden of proving the establishment of a causal connection between the decedent's employment and his fatal coronary attack rests with the appellees. The Board determined that the same had been established. The Board evidently believed that the exertion of lifting the 200 pound coping stone was an increase in the work load beyond the heart's ability to function.

> There being competent evidence to sustain their decision, the same is binding upon this court. *Clark* v. *Hughey* (1954), 233 Ind. 134, 117 N. E. 2d 360.

Judgment affirmed.

Ax, Cooper, and Myers, JJ., concur.

NOTE.—Reported in 178 N. E. 2d 217.