CONSUMERS COMPANY, ETC. *v.* JEFFERSON.

[No. 20,332. Filed July 13, 1965. Rehearing denied September 16, 1965. Transfer denied March 30, 1966.]

William F. Kane, Jr., and *Lucas, Clifford & Wildermuth*, of Gary, for appellant.

*John M. Ruberto,* of Gary, for appellee.

CARSON, J.—Appellee brought this action before the Industrial Board of Indiana for compensation under the Workmen's Compensation Act because of the death of Robert Jefferson, appellee's husband, which death allegedly occurred from personal injuries received by decedent by reason of his employment by the appellant. The single hearing member entered an award for the appellee, review was had before the full board and the full board entered its findings and award in favor of the appellee.

The sole assignment of error presented to this court is that the findings and award of the full Industrial Board of Indiana are contrary to law.

The facts are essentially as follows: Robert Jefferson the decedent, was a well developed negro male, age 35, weighing approximately 160 pounds; on February 15, 1960, and for a period of six months prior thereto he was employed as an iron picker with the appellant company; his job was one requiring heavy physical labor whereby he operated a picking belt and separated tramp iron from slag; in order to accomplish this task he used a three foot iron hook, weighing three to four pounds; the job was such that at times he was required to sit and other times to stand; prior to this job he had worked several years with the appellant as a clean-up man in the screening building.

The evidence showed further that, although not a regular part of his work, Jefferson would occasionally (2 or 3 times a week) assist in greasing certain screens used in this operation. These screens were greased every eight hours. The greasing process required approximately one half-hour for two men to perform. Jefferson's role was to pump the grease

onto the screens. The pumping activity required exertion and body movement very similar to operating a jack on an automobile.

Although there is some conflict in the evidence it appears that the normal working day, at least in terms of pay scale, was an eight hour day, any time accrued in excess of eight hours being rewarded by a time and a half scale. Jefferson had occasionally worked overtime in the past and did so on February 15, 1960.

On the morning of February 15, 1960, Robert Jefferson reported to work at 7:00 a.m. His regular working hours that day were from 7:00 a.m. to 3:30 p.m. To his fellow workers Jefferson appeared jolly, happy and in normal physical condition. He performed his usual work as an iron picker without complaint and at 3:30 when asked by his foreman, agreed to work overtime. From 3:30 until shortly after 4:00 Jefferson pumped grease onto the screens. Upon completion of this job the foreman asked Jefferson and a co-worker to obtain from the screening-house a ladder belonging to a painting company. In order to comply Jefferson had to climb a flight of stairs some thirty feet in length and relatively steep. He ascended the stairs, walked a further twenty feet, collapsed upon the floor and died shortly thereafter.

An autopsy was performed and the cause of death determined to be hypertensive cardiorenal disease with acute heart failure. The autopsy also showed that Robert Jefferson had one kidney that was smaller than the other, a condition it seems which will often propagate a hypertensive situation whereby enlargement of the left ventricle of the heart results and the heart eventually fails. The anatomic diagnosis of the autopsy report showed an enlargement of the muscle mass of the heart. Such a condition, as was stated on direct examination by Dr. Jack Whittaker, is "based on high blood pressure and that is mediated through his kidney disease" and could possibly have been coming on for a period of ten years. There was no evidence in the autopsy of sudden dam-

age or change in the heart structure. The acute left heart failure which resulted in Jefferson's death took place when the capacity of the heart was exceeded, the lungs filled with fluid and congested and Jefferson succumbed.

Dr. Jack Whittaker, a witness for the plaintiff on direct examination was presented a hypothetical question assuming the facts previously set out and was then asked whether he had an opinion as to whether or not there was a causal relationship between the decedent's regular work in combination with his overtime work, the pre-existing heart disease and the death of the decedent. Supporting an affirmative reply he testified as follows:

"A   Well, in view of my autopsy findings I would feel that there would be a causal relationship between his routine work superimposed on the overtime work which took place, and I would think that would—think that would constitute a causal relation in the autopsy findings of acute left ventricular heart failure."

\*   \*   \*

"Q   Let me ask you this question. Assuming the facts in the hypothetical question, have you an opinion based on a reasonable degree of medical certainty as to whether or not the decedent's regular work in combination with his extra work, which was not his usual work on that day, was sufficient to aggravate his pre-existing heart disease and precipitate his death?

A   Yes, I do.

Q   What is that opinion?

A   I feel that it definitely would have a bearing and this is based on the fact that at autopsy he obviously had been previously in a compensated state. By that I mean his heart, although it was a damaged heart, it was a large heart, *that it had been fulfilling its functional duties within its capacity, because this man had no evidence of a chronic congestive failure picture whatsoever at autopsy. He did have the picture of acute congestive failure, and by that reason I would say yes, that his overtime work superimposed on his routine work would have caused the relationship.*" (Our emphasis)

Dr. George C. Coe, a witness for plaintiff, in response to the same hypothetical, testified in part as follows:

"A It is my opinion that his regular work, plus the additional burden of the extra work he was called upon to do in pumping the grease gun and in walking up too steep an incline after his regular working hours was sufficient and ample to aggravate the pre-existing hypertensive cardiorenal disease and bring about his death."

Dr. Robert James Bills, a witness for the defendant on cross-examination, gave the following testimony:

"Q Therefore, would you say that pumping grease—when the decedent was pumping grease created a—was an over-exertion for the decedent's diseased heart at that time?

A For this particular heart might the end result that happened? Why obviously, for this man his physical activity that day was too much for his heart.

Q Would you say the physical activity of pumping grease for about half an hour was an over-exertion for his diseased heart on that day?

A As it has been shown, obviously the activity he did, including the overtime, going up the stairs, was too much for his heart."

\* \* \*

"MEMBER: Climbing those stairs can be more physical activity than pumping grease?

A It depends on how fast he went up too.

MEMBER: But that is quite physical activity?

A That was the straw that broke the camel's back in his case, yes.

Mr. Ruberto: What was the straw?

A Going up those stairs after his other activity.

Mr. Kane: It was all cumulative?

A Yes."

In a review of an Industrial Board award this court is bound by the well-established rule that the Industrial Board,

being the trier of facts, its decision thereon is binding upon this court if such decision is sustained by competent evidence. *Clark* v. *Hughey* (1954), 233 Ind. 134, 117 N. E. 2d 360.

The appellant's contention is that the evidence was not competent, conclusive nor sufficient in probative value to prove that decedent, Robert Jefferson, died as a result of an accident arising out of and in the course of his employment within the Workmen's Compensation Act. This court must therefore determine whether the evidence before us is sufficient to sustain the finding and award of the Board.

In order for an award by the Industrial Board to be sustained proof must be made of a causal connection between the act resulting in the injury and the performance of some service of the employment. *Chicago, I. & L. R. Co.* v. *Clendennin* (1924), 81 Ind. App. 323, 143 N. E. 303. Where the claim for compensation, as in the case at bar, involves death from heart failure, the causal determination will be made under clearly defined lines. The Supreme Court of this State stated the determinative factor in the case of *U. S. Steel Corp.* v. *Dykes* (1958), 238 Ind. 599, 154 N. E. 2d 111, at page 607:

"The causal question here is; Was the inability of decedent's heart to meet the demands, i.e., the 'coronary insufficiency,' caused by a change i.e., *an increase in the work load beyond the heart's ability to function,* or by a decrease in the heart's ability to meet an unchanged demand. The 'cause' is that which has changed, not that which remains constant." (Our emphasis)

In the same opinion the court stated further at page 613:

"The mere showing that he was performing his usual routine everyday task when he suffered a heart attack does not establish a right to workmen's compensation because there was no event or happening beyond the mere employment itself."

It is clear from the above that a claimant must do more than show a mere coincidence in time between hours of employment and the fatal attack. The extent to which a causal relationship must be established before compensation is merited was set forth by this court in applying the *Dykes case, supra,* to the case of *Douglas* v. *Warner Gear Division, etc.* (1960), 131 Ind. App. 664, 174 N. E. 2d 584, at page 672:

> "The Court in said Dykes case, supra, announced in substance, as we see it that to establish a compensable right it must be shown not merely that the employee suffered a heart attack while performing his usual routine everyday tasks but that there must be shown an 'event or happening beyond the mere employment itself.' Broadly, that it must be shown that the employment, or the condition of the employment, must have been, in some proximate way, accountable for, conducive to, or in aggravation of or the hastening of, the failing activity of the heart."

The evidence demonstrated that the decedent, on the date of his death, performed his usual work. In addition thereto he worked overtime and for a period of one-half hour performed the strenuous task of pumping grease onto a screen, an activity that entailed the continuous up and down movement of the arm and body. Thereafter he climbed a flight of stairs, some 30 feet in length and steep in nature. Testimony was given by three doctors, one a witness for the defendant, that in their opinion, a causal relationship existed between the ordinary work performed by the decedent, the superimposed overtime work, the climbing of the stairs and the subsequent failure of decedent's heart. The medical expert for the defendant testified that the stair climbing ". . . was the straw that broke the camel's back."

It is the opinion of this court, after carefully reviewing the evidence that this is not a case where a decedent suffered a fatal heart attack while engaged in his "usual routine everyday tasks." The evidence clearly demonstrates that appellee's claim comes within the compensable

limits of the *Dykes case, supra,* in that the accident and ensuing death were caused by "an increase in the work load beyond the heart's ability to function . . ."

We therefore hold that the finding and award of the Full Industrial Board is not contrary to law. The judgment of the Industrial Board is affirmed.

Prime, P. J., and Faulconer, J., concur.

While Judge Martin participated in the hearing of the oral argument and conference of the Judges above named, he did not participate in the adoption of this final opinion.

NOTE.—Reported in 209 N. E. 2d 32.