Nancy C. **JABLONSKI, surviving spouse and next friend for John Daniel Jablonski and Bryan Kurtis Jablonski, Appellants (Plaintiffs),**

v.

**INLAND STEEL COMPANY,**
Appellee (Defendant).

No. 93A02–9012–EX–00718.[1]

Court of Appeals of Indiana,
Fifth District.

Aug. 7, 1991.

Rehearing Denied Sept. 6, 1991.

1. This case has been diverted to this office by order of the Chief Judge.

Anna S. Rominger, Sendak, Sendak, Neff & Rominger, Crown Point, for appellants.

Gregory R. Leman, Singleton, Levy & Crist, Munster, for appellee.

RUCKER, Judge.

This is an appeal from a decision of the Full Worker's Compensation Board denying a claim for benefits under the Worker's Compensation Act. Ind.Code § 22–3–2–2 *et seq.*

The widow and two minor children of Daniel Jablonski (collectively referred to as "the Jablonskis") sought compensation for Daniel's death which occurred while Daniel was employed with Inland Steel Company. The matter was heard before a single Hearing Member who determined that Daniel's death did not arise out of his employment. The Jablonskis appealed to the Full Worker's Compensation Board which affirmed the Hearing Member's decision.

The Jablonskis present three issues for our review which we combine as one: Did the Worker's Compensation Board err in affirming the Hearing Member's decision which found that Daniel Jablonski's death did not arise out of his employment with Inland Steel Company?

We find the Board did not err and we therefore affirm.

On December 22, 1984, Daniel Jablonski was working his normal 2:30 p.m. to 10:30 p.m. shift as an Operations Clerk for Inland Steel. Daniel's job did not involve any physical labor; rather, it was a desk assignment that entailed collecting data. Shortly after returning from his dinner break, Daniel, while stationed at his desk, experienced difficulty in breathing, complained of having something stuck in his windpipe and complained of chest pains. A co-employee telephoned Inland's medical department which dispatched Paramedic Jeffrey Tarr and Emergency Medical Technician Pat Horn to the scene. Upon their arrival, Daniel no longer complained of chest pains; instead, Daniel indicated that he was feeling a tingling sensation in his upper extremities and experiencing dizziness. Although Daniel appeared to be in stable condition, the paramedics nonetheless summoned an ambulance to transport him to a nearby hospital.

En route to the hospital Daniel's heart experienced a rapid and irregular rhythm, medically referred to as ventricular fibrillation. He then became unconscious and stopped breathing. The paramedics initiated certain medical procedures and contacted emergency medical personnel at the hospital for additional instructions. In spite of their efforts the paramedics were unsuccessful in reviving Daniel who was pronounced dead on arrival at the hospital. Daniel was thirty-seven years old and had no recorded history of heart disease.

Additional facts will be discussed below as necessary.

## I.

It is the burden of the claimant to prove a right to compensation under the Worker's Compensation Act. *Glenn v. Board of Commissioners* (1990), Ind.App., 552 N.E.2d 485. Therefore, in seeking review of the Board's adverse determination the Jablonskis appeal from a negative judgment. This court is bound by the factual determinations of the Board and may not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. *Eastham v. Whirlpool* (1988), Ind.App., 524 N.E.2d 23, *trans. denied.* In order to reach a contrary conclusion we may not disregard any reasonable inferences drawn by the Board from the facts that the evidence tends to prove. *Id.*

After hearing argument the Board adopted the Hearing Member's detailed and extensive Findings and Conclusions which included the following:

1. That Daniel F. Jablonski was an employee of Inland Steel Company, at their East Chicago plant, in East Chicago, Indiana, and had been an employee of Inland Steel Company for approximately (12) years. He had worked as an Operations Reporting Clerk earning an average of Six Hundred One and 89/100 Dollars ($601.89) per week plus benefits.

2. That an Operations Reporting Clerk is a clerical position involving work at a desk without any physical exertion and a position which does not involve stress.

3. That in the one (1) week period preceding his death, Daniel Jablonski did not work any overtime, did not have any physical exertion or stress at work.

4. That on December 22, 1984, Daniel Jablonski reported to work complaining of physical problems, including what he believed to be sinus problems.

5. That on December 22, 1984, Daniel Jablonski did not engage in any physical exertion, nor was he working under any stress that day. Furthermore, Daniel Jablonski was sitting at a desk when his medical problem began.

6. That Daniel Jablonski died on December 22, 1984, from cardiac arrest due to cardiomegaly, left ventricle hypertrophy and coronary atherosclerosis.

7. That at the time of his death, Daniel Jablonski was a 37 year-old white Caucasian male, with no prior history of heart disease.

\* \* \* \* \* \*

22. That Jeffrey Tarr did not believe that he had a cardiac patient until the ventricular fibulation [sic] occurred in the ambulance.

23. That Dr. Johnson acknowledged that Daniel Jablonski did not have any chest pains from the point that the paramedics arrived to the point that the incident occurred in the ambulance. He further acknowledged that an individual would have to rely upon a patient's description of the problem. Daniel Jablonski indicated to Jeff Tarr when he arrived that he had no cardiac condition, no prior problems with a condition and did not describe the symptoms which would have lead Jeff Tarr to believe that there was a cardiac problem.

24. That Dr. Johnson could not testify as to any causal link between the action of any Inland employee and Mr. Jablonski's death.

25. That the plaintiffs failed to produce any evidence that Daniel Jablonski's death arose out of his employment with Defendant, Inland Steel Company.

*Record* at 27–31.

The Jablonskis particularly dispute the Board's Finding Number 24, and argue that based on the evidence, the Board could reasonably have found there was a causal connection between the actions of the Inland paramedics and Daniel's death.

In order to recover benefits under the Act a claimant must show:

1. personal injury or death by accident;
2. personal injury or death arising in the course of employment; and
3. personal injury or death arising out of employment.

Ind.Code § 22–3–2–2(a); *Evans v. Yankeetown Dock Corp.* (1986), Ind., 491 N.E.2d 969, 973, *reh. denied.*

The parties do not dispute and the record confirms that Daniel's death occurred "by accident". The statutory term "injury or death by accident", as used in the worker's compensation act, means unexpected injury or death. *Id.* at 975.

In the case before us, Daniel's death was both unexpected and unintentional. Therefore, under the meaning of the Act Daniel's death occurred "by accident".

The parties to this action also agree and the record confirms that Daniel's death arose in the course of employment. The phrase "in the course of" refers to the time, place and circumstances under which an "accident" occurs. *Lincoln v. Whirlpool Corp.*, (1972), 151 Ind.App. 190, 279 N.E.2d 596, *reh. denied.* Therefore, if death occurs within the period of employment at a place where the employee may reasonably be, and while he is fulfilling the duties of his employment, then the death arises in the course of employment. *Indiana & Michigan Electric Co. v. Morgan* (1986), Ind.App., 494 N.E.2d 991, *trans. denied.*

The entire episode in this case occurred on Inland Steel Company property and began while Daniel was seated at his desk, during normal working hours, and while Daniel was performing his appointed duties. The statutory requirement of "in the course of employment" has been satisfied.

■ In dispute here is whether Daniel's death arose "out of employment". Hence, the Jablonskis carry the burden of demonstrating a causal connection between the death and the employment. *Evans, supra; Donahue v. Youngstown Sheet & Tube Co.* (1985), Ind., 474 N.E.2d 1013.

■ The Jablonskis argue the treatment Daniel received at the hands of Inland paramedics was negligent and provides the causal link which caused Daniel's death. In support of their argument the Jablonskis direct our attention to several events which they contend demonstrate the paramedics' negligence: (1) the initial delay in finding Daniel's location at Inland; (2) the failure to properly assess Daniel's condition

from the information he provided; (3) the failure to immediately establish an I.V.; (4) stopping the ambulance instead of proceeding directly to the hospital once Daniel experienced ventricular fibrillation; and (5) generally failing to follow Inland's written procedure (Protocol) concerning the type of emergency with which the paramedics were faced.

In reviewing these contentions we may not substitute our judgment for that of the Board. We will not reweigh the evidence nor judge the credibility of witnesses. Rather, this Court will only consider that evidence which tends to support the Board's decision. The Findings of the Board will not be disturbed unless the evidence is undisputed and leads inescapably to a contrary result. *Rensing v. Indiana State Univ. Bd. of Trustees* (1983), Ind., 444 N.E.2d 1170, 1172.

Dr. John Johnson, a witness for the Jablonskis and an expert in the field of emergency medicine, gave extensive testimony much of which was highly critical of the actions taken by the Inland paramedics. Dr. Johnson testified that the actions of the Inland employees "did not help [Daniel] live" and that Daniel did not have the "benefit of appropriate medical care from the paramedics in charge of this case". The Jablonskis argue that based on Dr. Johnson's testimony there was sufficient evidence from which the Board could reasonably infer that Inland's treatment failed to meet applicable medical standards and therefore caused Daniel's death.

However, Dr. Johnson's testimony also reveals that the conditions which caused Daniel's death were progressive and developed over a period of time; that even if the proper procedures were employed there was no assurance that Daniel would have survived; that he could not testify that anything the paramedics did directly caused Daniel's death; and that it would be pure conjecture whether Daniel would have lived even if the paramedics had followed Inland's written Protocol. The following exchange is instructive:

Q: As you sit here today, you cannot indicate whether Mr. Jablonski would

have survived if all of these events had occurred in a hospital surrounded by physicians, can you?

A. Correct.

Q: So of the four factors that you mentioned you can't testify that any of them directly caused Mr. Jablonski's death?

A: Directly caused? No.

\* \* \* \* \* \*

Q: While I understand you to say, If I am correct here, that that didn't directly cause his death—

A: Correct.

Q: Could that have contributed to his death in any way?

A: It is a semantics issue. What they did did not help him to live. I can't say that anything that they specifically did killed him or caused his death.

*Record* at 215, 218.

Dr. Johnson's testimony does not inescapably lead to a conclusion that Daniel's death was causally connected to Daniel's employment. In proving that causal link the Jablonskis must demonstrate that Daniel's heart failure was either preceded by some untoward or unexpected incident, or resulted from the aggravation of a previously deteriorated heart or blood vessel. *United States Steel Corp. v. Dykes* (1958), 238 Ind. 599, 154 N.E.2d 111. The mere showing that Daniel was performing his usual everyday tasks when he suffered the fatal heart attack does not establish a right to worker's compensation benefits unless there was some event or happening beyond mere employment. *Id.*

Here the Board determined there was no causal connection between Daniel's death and Daniel's employment. The record supports that determination. Even if we were to agree with the Jablonskis that another result could have been reached, we are not at liberty to substitute our judgment for the judgment of the Board. *Holloway v. Madison–Grant United School Corp.* (1983), Ind.App., 448 N.E.2d 27, *trans. denied.*

II.

■ The Jablonskis also contend that the actions of the paramedics deprived Daniel of his "chance of life." The record reveals statistical evidence from the American Heart Association indicating that over 50% of heart attack patients die before they ever reach a hospital and that the majority of that number "could, indeed, be taken to the hospital alive" if appropriate critical care had been administered. The Jablonskis argue the paramedics' negligence and failure to follow the written protocol deprived Daniel of his chance of survival.

The "loss of chance" doctrine is a medical malpractice rule of proximate cause which has not been specifically adopted in the State of Indiana. *See Watson v. Medical Emergency Services* (1989), Ind.App., 532 N.E.2d 1191, 1196 n. 2, *trans. denied.* The doctrine requires an injured party to establish that if proper treatment had been given, then better results would have followed. *Id.* The Jablonskis argue the matter before us, regarding Inland's fault, is in the nature of malpractice and therefore we should adopt the "loss of chance" doctrine and apply it in this case.

Even if we were to adopt the "loss of chance" doctrine and apply it to the facts in the case at bar, our decision today would not be influenced by the Heart Association's statistical findings.

The focus here centers on causal connection. In essence we must ask whether it was more probable than not that Daniel Jablonski would have lived but for the actions or inactions of Inland paramedics. The statistical data, at best, demonstrates Daniel may have had slightly less than a 50% chance of survival. Consequently, we cannot say if Daniel had received proper critical care, then a better result would have followed. *Watson, supra.*

III.

■ Finally, the Jablonskis contend the decision of the Board should be reversed for reasons of public policy. The Jablonskis argue that under Ind.Code § 16–1–39–1 *et seq.* (Emergency Medical Services) the Indiana Legislature has declared its inter-

est in promoting and regulating an effective system of emergency medical services. Therefore, if a company chooses to provide such care then it must be responsible for the quality of that care. The Jablonskis conclude that if as a result of the care the employee suffers a personal injury or death then the company must be prepared to award the statutory compensation to the dependants of the deceased employee.

The Jablonskis seem to suggest that the intent of the Emergency Medical Services statute is to provide a per se rule of liability. That is not the case. The statute does set forth a detailed regulatory and enforcement scheme affecting the public health, safety and welfare of the people of the State of Indiana. However, the statute also dictates that neither a certified emergency medical technician nor his employer is liable for acts or omissions in rendering emergency services absent negligence or willful misconduct. Ind.Code § 16-1-39-19.

In any event, the right and responsibility to determine the public policy of any given legislation, and to adopt, improve, refine, and perfect legislation directed thereto, falls not to this court but to the legislature. *Evans, supra.*

We conclude the Worker's Compensation Board did not err in affirming the Hearing Member's decision which found that Daniel Jablonski's death did not arise out of his employment with Inland Steel.

Judgment affirmed.

BARTEAU and SHARPNACK, JJ., concur.