**Dallas McKAIN, Plaintiff–Appellant,**

v.

**Kenneth BISSON, M.D.,
Defendant–Appellee.**

No. 92–3419.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1993.

Decided Dec. 21, 1993.

C. Fred Partin, Bryan J. Dillon (argued), Louisville, KY, for plaintiff-appellant.

Edward L. Murphy, Jr., Diana C. Bauer (argued), Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, for defendant-appellee.

Before POSNER, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

FAIRCHILD, Circuit Judge.

Plaintiff–Appellant Dallas McKain ("McKain") commenced this medical malpractice action alleging that defendant-appellee Kenneth Bisson, M.D. ("Dr. Bisson") was negligent when he failed to diagnose McKain's myocardial infarction (we will use the term "heart attack")[1] and failed to admit McKain to the hospital. Dr. Bisson removed this action to federal district court,[2] and the parties consented to proceed before a United States Magistrate Judge. A jury returned a general verdict in favor of Dr. Bisson. McKain challenges several rulings regarding jury instructions on his appeal, and also moves for certification of a question of state law as to one of them. We affirm the judgment and deny the motion for certification.

## I. BACKGROUND

At 11:00 p.m. on June 1, 1989, McKain, a truck driver, left his home near Louisville, Kentucky to drive his truck to Michigan. At 6:00 the next morning, he began experiencing double vision and chest pains, so he stopped his truck in Angola, Indiana. He was taken by ambulance to a hospital in Angola, where he was admitted to the emergency room at 9:20 a.m.

The emergency room record ("the ER record") indicates that McKain began suffering from chest pain which radiated into both arms around 6:00 a.m., with shortness of breath, and sweatiness; the fact that McKain had undergone triple bypass surgery in 1985 was also noted on the ER record. Shortly after being admitted, Dr. Bisson, McKain's physician in the emergency room, ordered that McKain be given nitroglycerin, presuming that McKain may have been having heart problems; the nitroglycerin gave McKain some relief, and he slept.

Dr. Bisson testified that McKain's major complaint to him was dizziness and weakness. Dr. Bisson ordered a number of tests, the results of which Dr. Bisson did not interpret as indicating that McKain was having a heart attack. Dr. Bisson diagnosed McKain's condition as non-cardiac chest pain, anxiety, and vestibular neuronitis (a disorder of the nerve which carries messages from the inner ear to the brain, which may cause dizziness).

The record developed below is not clear as to whether McKain told Dr. Bisson just prior to his discharge that he still had chest pains. At trial in September 1992, McKain testified that he did so. In a February 1991 deposition, however, McKain stated in response to one question that he did not. In response to

---

1. The doctors who testified at trial used the terms "myocardial infarction" and "heart attack" interchangeably. A heart attack was defined at trial as "permanent irreversible heart damage, a scar in the heart that occurs when there is either temporarily or permanently a loss of blood flow...." Sept. 2, 1992 Tr. at 36.

2. Jurisdiction is founded on diversity. Indiana law controls all substantive issues.

a subsequent question at the deposition, McKain stated that he told Dr. Bisson that his chest pains were getting a little better.[3]

Dr. Bisson's written instructions, contained on the bottom of the ER record, were to "use medication as directed" and "return if pain or weakness worsens." Pl.'s Ex. 3. Both Dr. Bisson and McKain signed the ER record just below the instructions.

The staff nurse who attended to McKain testified that standard procedure at the hospital was to read written instructions to a patient, attempt to ensure that the patient understood the instructions, have the patient sign the ER record, and then give a copy to the patient. McKain does not remember signing the ER record, and testified that he did not receive a copy nor was he told by Dr. Bisson to return if his pain or weakness worsened.

McKain was discharged at 11:20 that morning, and taken by police car to a hotel. (Angola does not have taxi service.) McKain's daughter, son ("Scott") and daughter-in-law picked him up at the hotel around 5:00 p.m. They took McKain to Indianapolis, where Scott lived. McKain continued to experience chest pains. At one point during the drive to Indianapolis, Scott was going to exit the highway to take his father to a hospital in Fort Wayne, Indiana, but McKain insisted on seeing his own doctor in Louisville.

McKain's girlfriend (now his wife), sister and two friends picked McKain up from Scott's home in Indianapolis to take him to Louisville. McKain's wife testified that during the trip, McKain was experiencing chest pain, and she believed that it was a life-threatening situation. She felt that maybe they should go to the nearest hospital, but

McKain once again insisted on seeing his own doctor in Louisville. On reaching Louisville, McKain was admitted to a hospital at 1:29 a.m. on June 3. Testing indicated that he had suffered a heart attack at some point on June 2.

McKain has progressive coronary heart disease. Out of twelve siblings, all but one (a sister who had a different mother) have or had heart problems. In August 1985, McKain underwent triple bypass surgery after suffering a heart attack. McKain had two more heart attacks in the summer of 1992, and again underwent bypass surgery.

Pursuant to Indiana law, McKain filed a complaint with the Indiana Department of Insurance prior to filing suit in court. A medical review panel rendered an advisory opinion, which was entered into evidence at trial. The panel found that Dr. Bisson had "failed to comply with the appropriate standard of care" when he misdiagnosed McKain's condition. The panel was unable to determine whether McKain suffered any damages as a result of the misdiagnosis.

## II. DISCUSSION

### A. The Loss of Chance Doctrine

#### 1. McKain's Proposed Instruction

McKain contends that the magistrate judge erred when he refused to instruct the jury on the loss of chance doctrine, under which a plaintiff's burden in proving proximate cause is lessened. McKain asserts that

> [n]egligence in failing to diagnose the heart attack is not a "cause" of the heart attack. The negligence, however, deprives the patient of the opportunity to receive various treatments which have been recog-

---

3. The following testimony from the February 1991 deposition was read at trial:

"QUESTION: What did you do when he [Dr. Bisson] told you there was nothing wrong with you?"

"ANSWER: I told him I didn't feel good. Asked him if I could stay until I could get some help, somebody to pick me up and take me somewhere to get me some help."

"QUESTION: What did he say?"

"ANSWER: He told me that there was nothing wrong with me, but he had me transportation."

"QUESTION: Did you tell him that you were still having chest pains at that time?"

"ANSWER: No, I didn't tell him at that time that I was having them."

"QUESTION: Did you tell him that the chest pains had gotten better while you were at the hospital?"

"ANSWER: I told him that I was a little— the chest pains we're [sic] a little better, but—" Sept. 1, 1992 Tr. at 101–2.

nized in the medical community as either lessening the damage sustained in a heart attack, or in some cases, preventing the heart attack all together.

McKain Br. at 14.

McKain proposed the following instruction:

If you find, that the Defendant, Kenneth Bisson M.D., was negligent in his treatment of the Plaintiff, Dallas McKain, and if you further find that the Defendant's negligence was a substantial factor in reducing the Plaintiff's chances of obtaining a better result, or if you find that the Defendant's negligence was a substantial factor in increases [increasing] the risk of the harm that the Plaintiff suffered, then you shall award the Plaintiff damages for such loss of chance.

Pl.'s Proposed Instruction No. 6. McKain's basic position is that had McKain been admitted to the hospital, there would have been opportunities to give certain treatments to prevent, or at least reduce the damages from, his heart attack.

We look to whether the jury instructions as a whole so misguided the jury that McKain was prejudiced. *Timmerman v. Modern Industries, Inc.,* 960 F.2d 692, 696 (7th Cir.1992) (citation omitted). McKain's proposed instruction must correctly state Indiana law. *Northbrook Excess & Surplus v. Proctor & Gamble,* 924 F.2d 633, 638 (7th Cir.1991). Under current Indiana law, a plaintiff has the burden of proving the following to establish a prima facie case of negligence in a medical malpractice action: (1) the standard of care the doctor owed the plaintiff; (2) a breach of that standard of care; and (3) the plaintiff suffered a compensable injury proximately caused by the doctor's breach. *Bonnes v. Feldner,* 622 N.E.2d 197, 199 (Ind.Ct.App.1993); *see also Oelling v. Rao,* 593 N.E.2d 189, 190 (Ind.1992).

### 2. Loss of Chance in Indiana

▮ Indiana courts have on occasion discussed the loss of chance doctrine, as quoted below. While none of these cases pronounces the doctrine unsound, the courts have found reasons it would not be applied to the case at hand even if adopted in Indiana.

Indiana precedent has not specifically adopted the medical malpractice rule of proximate cause which is couched in terms of "loss of chance." This doctrine, as employed in other jurisdictions, requires establishment by a plaintiff that if proper treatment had been given, better results would have followed.... We do not consider the proximate cause issue before us by application of the "loss of chance" doctrine. Rather, as noted above, we resolve the matter solely in terms of our prior law with respect to proximate cause and that the evidence must disclose more than a mere possibility.

*Watson v. Medical Emergency Services,* 532 N.E.2d 1191, 1196 n. 2 (Ind.Ct.App.), *transfer denied* (1989) (affirming summary judgment because no issue of fact regarding proximate cause in medical malpractice action for negligent failure to diagnose and treat lung cancer).

The "loss of chance" doctrine is a medical malpractice rule of proximate cause which has not been specifically adopted in the State of Indiana....

Even if we were to adopt the "loss of chance" doctrine and apply it to the facts in the case at bar, our decision today would not be influenced by the Heart Association's statistical findings [that over 50% of heart attack patients die before they ever reach a hospital and that the majority of that number "could, indeed, be taken to the hospital alive" if appropriate critical care had been administered].

The focus here centers on causal connection. In essence we must ask whether it was more probable than not that Daniel Jablonski would have lived but for the actions or inactions of Inland paramedics. The statistical data, at best, demonstrates Daniel may have had slightly less than a 50% chance of survival. Consequently, we cannot say if Daniel had received proper critical care, then a better result would have followed.

*Jablonski v. Inland Steel Co.,* 575 N.E.2d 1039, 1043 (Ind.Ct.App.1991), *transfer denied* (1992) (affirming Worker's Compensation Board decision finding that plaintiff's death did not arise out of his employment; reject-

ing allegation that paramedics were negligent en route to hospital, and therefore deprived heart attack victim of his "chance of life").

> [W]e decline the ... invitation to discuss the effect of a loss of a chance of life on the issue of proximate causation, as that question is not before us [because once liability is settled, proximate cause is established].

*Dillon v. Glover,* 597 N.E.2d 971, 974 (Ind. Ct.App.1992) (affirming damages award from Patient's Compensation Fund after widow settled medical malpractice action for negligent failure to discover tumor in x-ray; ruling that issue of proximate cause could not be litigated because settlement establishes liability).

Although the Indiana Supreme Court has not discussed the loss of chance doctrine, it recently noted that "[a]s in other tort actions, a plaintiff alleging medical malpractice must show that the defendant, owing a duty to the plaintiff, violated a standard of reasonable care, causing injury to the plaintiff." *Wright v. Carter,* 622 N.E.2d 170, 171 (Ind.1993).

Adoption of any form of the loss of chance doctrine would be a significant modification of the present Indiana requirement of causation, and we conclude that refusal of the instruction was not error.[4]

### 3. Loss of Chance in Other Jurisdictions

States are not uniform in their adoption or interpretation of the loss of chance doctrine. For a comprehensive listing, *see Kramer v. Lewisville Memorial Hosp.,* 858 S.W.2d 397 (Tex.1993) and John D. Hodson, Annotation,

*Medical Malpractice: "Loss of Chance" Causality,* 54 A.L.R.4th 10 (1987 and 1993 Supplement). Courts which have departed from traditional proximate cause requirements in medical malpractice cases have generally gone one of two routes. One route requires a plaintiff to prove that with proper treatment, he or she would have had a greater than fifty percent chance of a better result. Alternatively, a plaintiff must only prove that the negligence increased the risk for the patient or diminished the patient's opportunity to achieve a better result.[5] 54 A.L.R.4th 10 at 18–19. McKain's proposed instruction incorporates the latter theory.

Not only does the "loss of chance" doctrine elude precise definition, but recovery of damages under the doctrine is also a confusing proposition. Courts have taken varying views on whether full damages are recoverable, or whether damages should be reduced so as to reflect the amount of chance that was lost (in itself a difficult determination); courts also do not agree on the types of damages that can be recovered. Martin J. McMahon, Annotation, *Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance,* 81 A.L.R.4th 485 (1990 and 1993 Supplement).[6]

### 4. Causation Evidence

■ The experts testified on causation as follows. McKain's expert, Dr. Kahn, testified that had McKain been hospitalized, and had he been given intravenous heparin (a blood thinner), McKain would have been ninety-three percent less likely to have a heart attack (assuming he was suffering from un-

---

4. As discussed in the next section, there are two distinct ways in which courts have used the loss of chance doctrine. We agree with the magistrate judge that the court in *Jablonski* "suggested that Indiana would not follow those jurisdictions which have held that a finding of causation in a medical malpractice [case] can be supported by testimony that the alleged malpractice merely increased the risk for, or diminished the opportunities of, the patient [as plaintiff proposes in his instruction on loss of chance]. Sept. 3, 1992 Mem. at 6; *see Jablonski,* 575 N.E.2d at 1043.

5. Perhaps this view is based upon the Restatement (Second) of Torts, § 323 (1965):

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the pro-

tection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

6. While McKain's proposed instruction implies that he would adopt the view that a plaintiff is entitled to damages resulting from the loss of chance and not to full damages, plaintiff's attorney was unable to articulate at oral argument how a jury would allocate damages if instructed on loss of chance.

stable angina when he was in the emergency room). Sept. 2, 1992 Tr. at 111–112. In response, Dr. Bisson's expert, Dr. Godley, discussed a number of reasons why he believed the conclusion that McKain's chances of having a heart attack would have been decreased by ninety-three percent with heparin was faulty. Sept. 3, 1992 Tr. at 28–9, 31.

Dr. Kahn also opined that had McKain been hospitalized, thrombolytic therapy (use of particular drugs to dissolve blood clots), if deemed appropriate, could have been administered; such therapy has been shown to be approximately eighty percent effective in unclogging arteries.[7] Sept. 2, 1992 Tr. at 65; Sept. 3, 1992 Tr. at 74. However, in statements made before trial, which were read to the jury, Dr. Kahn stated that he could not conclude whether McKain was a suitable candidate for thrombolytic therapy. Sept. 2, 1992 Tr. at 13–14; see also id. at 64–5. Dr. Godley testified that thrombolytic therapy would not have been appropriate for McKain. Sept. 3, 1992 Tr. at 13, 17.

In general terms not tied to a specific treatment, Dr. Kahn agreed with counsel's statement that McKain "suffered certain heart muscle damage from the June 2nd, 1989, heart attack that he would not have suffered" if he had been admitted to the hospital. Sept. 2, 1992 Tr. at 88–9. The extent of this damage is not discussed. He also stated, however, that "under the scenario of the heart attack beginning at 6:00 a.m., I am unable to distinguish the damage that would have occurred with admission versus the damage that would have occurred versus [with] discharge." Id. at 145. This statement illustrates the semantic difficulty in discussing this case; because McKain had certain symptoms around 6:00 a.m. which continued throughout the day, heart damage may have occurred before he saw Dr. Bisson. No expert was able to conclude when McKain suffered his heart attack on June 2. The possibility that it occurred at 6:00 a.m. was certainly not ruled out. The heart damage may also have occurred or increased after Dr. Bisson's diagnosis, and it is uncertain whether treatment after the diagnosis would have prevented any later occurrence or increase in damage.

Both Dr. Godley and Dr. Bisson's other expert, Dr. Chandler, testified that nothing could have prevented McKain's heart attack. Id. at 205–6, 209; Sept. 3, 1993 Tr. at 10–11, 40. Dr. Chandler testified that there was no evidence that the failure to hospitalize McKain caused any damage. Sept. 2, 1992 Tr. at 210. Dr. Godley testified that there were no medical damages as a result of the failure to hospitalize. Sept. 3, 1992 Tr. at 40.

We also mention that our review of Dr. Kahn's testimony does not indicate that he definitively concluded that the appropriate standard of care called for heparin. It was McKain's burden to show that any alleged negligence which led to damage was due to a failure to follow the standard of care dictated by the circumstances. Dr. Kahn did state, in the context of telling the jury the universe of treatments that would have been available (but not what should have been done), that heparin would have been "appropriate." Sept. 2, 1992 Tr. at 63. Both of Dr. Bisson's experts testified that the appropriate standard of care did not include the use of heparin. Id. at 206; Sept. 3, 1992 Tr. at 13. And, more specific to this case, Dr. Godley testified that the use of heparin would not have been warranted because McKain experienced relief from the nitroglycerin he was given. Sept. 3, 1992 Tr. at 29.

Nor did Dr. Kahn testify that the use of thrombolytic therapy was warranted under the standard of care appropriate to this case. See Sept. 2, 1992 Tr. at 13–14, 64–5. McKain therefore did not show that these treatments were warranted under the standard of care that Dr. Bisson owed McKain; these treatments may well not have been administered to McKain had he been admitted to the hospital.

Even if we look only to the evidence submitted by McKain and ignore any refutation by defendant, we do not perceive an evidentiary basis for the jury to have found differently if it had been instructed on loss of

---

7. Dr. Kahn did not testify as to the efficacy of thrombolytic therapy; the eighty percent figure was given by one of Dr. Bisson's experts.

chance. With respect to Dr. Kahn's opinion that the failure to admit increased McKain's damage, there was no attempt to quantify such increase in damage. Additionally, Dr. Kahn could not conclude that any damage had not occurred before McKain was seen by Dr. Bisson. If McKain's proposed instruction had been given, there was nothing in the record on which the jury could base a determination whether the failure to hospitalize was a "substantial factor" in increasing McKain's risk.

With respect to the two specific treatments that Dr. Kahn testified about, McKain did not demonstrate that such treatments were required under the appropriate standard of care and would have been given to McKain in the hospital. And, even if the jury found that heparin would have been administered, it is unlikely that the jury would have come out differently if instructed on loss of chance. If the jury accepted Dr. Kahn's testimony that if McKain was hospitalized and given heparin, there was a ninety-three percent likelihood that he would not have suffered the heart attack on June 2, the jury would have awarded damages to McKain under the proximate cause instruction that it did receive.[8]

We therefore conclude that McKain was not prejudiced by the magistrate judge's refusal to instruct the jury on loss of chance.

5.  Certification

■ McKain asks this court to certify the following question to the Indiana Supreme Court:

> Does Indiana recognize the Loss of Chance Doctrine as a basis for recovery in a medical malpractice case?

Circuit Rule 52 provides that this court may certify to the Indiana Supreme Court a question "arising under the laws of ...

[Indiana] which will control the outcome of a case" pursuant to the rules of Indiana's highest court. Rule 15(O) of the Indiana Rules of Appellate Procedure allows this court to certify a question of state law to the Indiana Supreme Court if it is determinative of the case and there is no clear controlling precedent from the Indiana Supreme Court.

In the present case, there is no conflict in Indiana decisions which would make certification more appropriate. *See Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1087 (7th Cir.1990). Nor is there a complete lack of guidance from Indiana courts, which have thus far been unwilling to adopt the loss of chance doctrine under the particular instances when urged to do so.

In our view, adoption of any form of the loss of chance doctrine would be a significant modification of the present Indiana requirement of causation. A state high court might well decide to modify its common law rules in any case coming before it. If we were persuaded of a strong judicial trend toward a particular new doctrine, and had a case before us in which the doctrine would seem to us to promote justice, we might consider certification appropriate. Certification would present an opportunity for the state court to consider the question. We decline to certify here, particularly because we conclude that the instruction proposed by plaintiff would not have made a difference in the present case.

B.  *Avoidable Consequences Instruction*

■ The magistrate judge instructed the jury as follows:

> [T]he defendant has also claimed a specific defense, that the doctrine of avoidable consequences prevents Dallas McKain from recovering those damages which proximately resulted from his failure to

---

**8.** The magistrate judge gave the following instruction on proximate cause:

> An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing an injury or damage and that the injury or damage was either a direct result or a reasonably probable

consequence of the act or omission. It's not necessary that the defendant's negligence be [the] only proximate cause.

. . . .

> However, if you find that Dallas McKain sustained damages that were proximately caused by a failure to hospitalize, then you may award him damages for those injuries.

Sept. 4, 1992 Tr. at 68, 72.

follow the discharge instructions of Doctor Bisson.

The defendant has the burden of proving the following proposition by a preponderance of the evidence: That as a proximate result of Dallas McKain's alleged unreasonable failure to follow the discharge instructions of Doctor Bisson, he sustained damages which could have reasonably been avoided if the instructions had been followed.

. . . .

If you find the defendant is liable, and the plaintiff has suffered damages, the plaintiff may not recover for any item of damages which he could have avoided through reasonable efforts.

Sept. 4, 1992 Tr. at 63, 76. McKain objected to these instructions on the grounds that there was no evidence to support a conclusion that McKain could have avoided any consequences. McKain now challenges the giving of these instructions.

■ Because this is a diversity action, we apply Indiana law to determine whether the substance of the jury instructions given was justified. *Timmerman,* 960 F.2d at 696. Under Indiana law, an instruction is justified if there is any evidence to support it; we look to the evidence favorable to Dr. Bisson and construe reasonable inferences from such evidence. *Underly v. Advance Machine Co.,* 605 N.E.2d 1186, 1191 (Ind.Ct.App.), *transfer denied* (1993).

Dr. Bisson gave instructions to McKain to return to the hospital if his pain worsened; McKain did experience such pain, but did not go to a hospital until he reached Louisville. McKain argues that since he was taken after his discharge to a hotel from which he had no transportation, he could not have returned to the hospital, and therefore there was no evidence that he did not exercise reasonable effort to avoid damages. In drawing reasonable inferences from the evidence in favor of Dr. Bisson, however, McKain could have

called the police, an ambulance, or had his family take him back to the hospital once they arrived, or to a different hospital during the drive to Louisville.

Thus, there was evidence to support the instruction, and McKain does not indicate any specific prejudice. We therefore conclude that instructing the jury on avoidable consequences was not reversible error.[9]

### C. *Contributory Negligence Instruction*

■ McKain contends that the magistrate judge erred when he gave a preliminary instruction on contributory negligence before the jury heard any evidence:

[T]he defendant has claimed a specific defense; that Dallas McKain was contributorily negligent and the defendant does have the burden of proving that defense by a preponderance of the evidence.

The defendant has the burden of proving the following proposition by a preponderance of the evidence: That the plaintiff, Dallas McKain, was negligent by failing to exercise reasonable care, by failing to following his follow his [sic] physician's reasonable instructions after undergoing triple bypass surgery in 1985, and that his failure to follow the instructions proximately caused the injury which the plaintiff complains.

Aug. 31, 1992 Tr. at 59–60.

At the close of evidence, the magistrate judge granted McKain's motion for judgment as a matter of law on the issue of contributory negligence. Before final arguments, the jury was instructed that because contributory negligence was no longer an issue in the case, the jury should not consider it.

McKain argues that the preliminary instruction and the ensuing evidence that McKain was a smoker was highly prejudicial.[10] The instruction itself, however, does not mention smoking. McKain does not take issue with the magistrate judge's conclusion that introduction of the smoking evidence

---

9. McKain also argues that no Indiana court has applied the doctrine of avoidable consequences to a medical malpractice action, an argument which he did not raise below. However, "Indiana also follows the general rule that a plaintiff's recovery for damages may be reduced if he fails to obey his physician's instructions and

thereby exacerbates or aggravates his injury." *Whitaker v. Kruse,* 495 N.E.2d 223, 226 (Ind.Ct. App.1986) (citing *Oliver v. Morrison,* 431 N.E.2d 140 (Ind.Ct.App.1982) and *Standard Oil Co. v. Bowker,* 141 Ind. 12, 40 N.E. 128 (1894)).

10. McKain, who is now in his sixties, has smoked cigarettes since he was thirteen years

would have been allowed as relevant to other issues even if the preliminary instruction on contributory negligence had not been given.

As McKain admits, the defense of contributory negligence is available to qualified health care providers (such as Dr. Bisson). Dr. Bisson raised the defense in his answer to McKain's complaint, and whether McKain was contributorily negligent was listed as a "contested issue of fact" on the magistrate judge's pre-trial order.

McKain does not specify any prejudice which resulted from giving the instruction. The jury would have heard the evidence on smoking even if the instruction was not given. We therefore conclude that any possible prejudice in mentioning contributory negligence at the beginning of trial was cured by the later instruction that the issue was gone and should not be considered.[11]

Accordingly, we DENY CERTIFICATION and AFFIRM.

---

old. Following his coronary bypass surgery in 1985, McKain's treating physician advised him to quit smoking. At the time of the incident now in question, McKain was smoking one to one and one-half packs of cigarettes a day.

11. Dr. Bisson additionally argues that McKain waived any objection to the contributory negligence instruction, asserting that McKain's objection at the pre-trial conference was not sufficient to preserve the issue absent a specific objection at trial. While it is incumbent upon parties to object and state the grounds for the objection with specificity, see Rule 51 of the Federal Rules of Civil Procedure, the purpose of Rule 51 is to ensure that the judge be apprised of a possible error. See Niehus v. Liberio, 973 F.2d 526, 529–30 (7th Cir.1992) and cases cited therein. McKain made his objection clear to the magistrate judge at the pre-trial conference. Aug. 28, 1992 Tr. at 32–3.