H. Wayne MAYHUE, M.D.,
Appellant–Defendant,

v.

Charles SPARKMAN, Appellee–Plaintiff.

No. 10A05–9210–CV–359.

Court of Appeals of Indiana,
Fifth District.

Jan. 31, 1994.

Rehearing Denied May 11, 1994.

Gregory J. Bubalo, Tracy S. Prewitt, Ogden Newell & Welch, Louisville, KY, for appellant-defendant.

Nicholas F. Stein, New Albany, for appellee-plaintiff.

BARTEAU, Judge.

■ Charles Sparkman filed a complaint against Dr. Wayne Mayhue to recover damages resulting from the death of Sparkman's wife, Norma. No suit was filed by Norma's estate; Sparkman filed only his own suit to recover for loss of consortium.[1] In the complaint for medical malpractice, Sparkman alleges that Mayhue negligently delayed in diagnosing Norma's cancer, and that the six-month delay was a proximate cause of Norma's death. The Medical Review Panel issued an unanimous opinion that Mayhue did not comply with the appropriate standard of care, but that "the conduct complained of was not a factor of the resultant damages." Mayhue filed a motion for summary judgment based upon the depositions of several expert witnesses who all agreed that Norma would have had a less than 50% chance of survival if the cancer had been diagnosed six months earlier.

The trial court denied the motion for summary judgment and this court accepted the interlocutory appeal to consider the issue whether a cause of action exists for a six-month delay in the diagnosis of cancer where the delay caused the decedent to lose a chance of recovery.

## FACTS

The facts are not in dispute. In 1981, Norma Sparkman underwent radiation therapy to treat her cervical cancer. At the time, Dr. Mayhue was her treating gynecologist. She remained under his care until 1985 when she returned to the care of her family physicians at the Havens Group. Pap smears taken from 1985 until October, 1988, revealed no abnormalities. On May 15 and May 23, 1989, pap smears taken by a doctor from the Havens Group did reveal abnormal cells. Norma was referred to Dr. Mayhue, whom she saw on May 26, 1989. Mayhue did not have the results of the pap smears taken on May 15 and 23, so he took another pap smear. This pap smear also showed abnormal cells. Mayhue believed the abnormal cells were the result of inflammation and not a recurrence of the cancer. Mayhue did not perform tests that revealed the cancer had returned until November of 1989.

Norma was referred to an oncologist, whom she saw on November 28, 1989. The biopsy revealed that Norma had uterine cancer. Exploratory surgery was performed on January 5, 1990. By that time, the cancer had spread to such an extent that surgery to remove it was not an option. Norma died in November, 1990.

For purposes of this appeal, the parties assume that Dr. Mayhue breached the standard of care. The expert testimony indicates that Norma would have had a better than

---

1. A spouse's loss of consortium claim is an independent cause of action. However, to recover for loss of consortium the plaintiff must prove the underlying negligence cause of action of the injured spouse. *See Greene v. Westinghouse Elec.* *Corp.* (1991), Ind.App., 573 N.E.2d 452, *reh'g denied, trans. denied; Rosander v. Copco Steel & Engineering Co.* (1982), Ind.App., 429 N.E.2d 990.

zero but less than 50% chance to survive if the cancer had been detected earlier.

## DISCUSSION

■ In a medical malpractice action, the plaintiff must prove that (1) the physician owed a duty to the plaintiff, (2) the physician breached that duty, and (3) the physician's breach proximately caused the plaintiff to suffer a compensable injury. *Watson v. Medical Emergency Services* (1989), Ind. App., 532 N.E.2d 1191, 1193, *reh'g denied, trans. denied.* This appeal concerns whether Dr. Mayhue's delay in detecting the cancer proximately caused Norma to suffer compensable injuries identified by Sparkman as (1) growth of the tumor, (2) a decreased chance of survival, and (3) death. We will treat (1) and (2) as one injury because the chance of recovery was lost due to the tumor's growth while undetected.

### Traditional Analysis

The difficulty faced by the plaintiff in a case such as this is the need to prove that the defendant's negligence caused the death where death might normally be expected to follow from the original disease—in this case, cancer. *See* Annot., 54 A.L.R.4th 10 (1987). Under the traditional proximate cause analysis, the plaintiff must prove that if proper diagnosis or treatment had been made, the patient would have survived. *Id.* This analysis focuses on whether the defendant's conduct more probably than not caused the plaintiff's injury or death. The compensable injury is the death or other complained-of *result.* Thus, if death more probably than not would have resulted even in the absence of malpractice, the plaintiff cannot recover. Stated another way, the traditional analysis requires the plaintiff to prove that in the absence of malpractice, the decedent had a greater than 50% chance of survival. *See, e.g., Cooper v. Sisters of Charity of Cincinnati* (1971), 27 Ohio St.2d 242, 272 N.E.2d 97 (declining to depart from traditional proximate cause analysis or to recognize a cause of action for "loss of chance").

This burden is impossible for the plaintiff to meet, however, where the patient probably would die from the condition or disease in the absence of negligence. Thus, even if the physician was blatantly negligent, no recovery could be had by a patient who was probably going to die.

### Loss of Chance Doctrine

Due to the often harsh application of the traditional approach, some courts have adopted a special rule of proximate cause to use in medical malpractice cases to determine whether a plaintiff has met the burden of proof on the element of proximate cause in a situation where the claim is that the defendant's negligence deprived the patient of a better result or the chance to survive. *See generally* 54 A.L.R.4th 10, *supra.* The plaintiff must only show the defendant's conduct deprived the patient of the *chance* of a better result or recovery. Stated differently, the plaintiff need only prove that the defendant's negligence deprived the patient of some *chance* of recovery. Many variations on this loss of chance doctrine have been applied by the courts.

Under the "pure" loss of chance doctrine, the plaintiff is required to show that it is more likely than not that the physician deprived the patient of some chance of a better result or recovery absent the malpractice. The compensable injury is not the *result,* i.e. death, but the *loss of the chance* the patient would have had for recovery or for a better result if the defendant had not been negligent. *See generally* Joseph King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981) (hereinafter cited as *King* ).

Other courts require the plaintiff to show that the physician increased the risk of harm to the patient by depriving the patient of a chance to recover. However, these courts go one step further and allow, without any further evidence, the fact-finder to infer that the increased risk was a proximate cause of the injury. As under the traditional analysis, the injury is generally defined by the court as the ultimate *result,* i.e., death. Thus, the plaintiff may recover where it is merely *possible* that the defendant caused the injury. This is a variation of the loss of chance doctrine with a relaxed causation standard,

which we refer to as the § 323 approach. *See, e.g., Hamil v. Bashline* (1978), 481 Pa. 256, 392 A.2d 1280.[2]

Under the traditional analysis—focusing on death as the injury—Sparkman cannot survive summary judgment because the evidence shows that Norma would not have had a better than 50% chance of survival if the cancer had been detected earlier. Consequently, Sparkman urges us to adopt the loss of chance doctrine. Indiana has not had the opportunity to directly decide whether to depart from the traditional causation analysis in medical malpractice cases of this type, although the loss of chance theory has been discussed in dicta. *See Jablonski v. Inland Steel Co.* (1991), Ind.App., 575 N.E.2d 1039, *reh'g denied, trans. denied; Watson,* 532 N.E.2d 1191. In *Watson,* the Second District faced a fact pattern very similar to this case. The decedent was not diagnosed with lung cancer until it was inoperable. Assuming that the defendants negligently failed to diagnose the cancer sooner, the court turned to whether the plaintiff showed that earlier detection would have prolonged the decedent's life. The most favorable testimony indicated that some treatments under some circumstances *might* prolong life, but none of the experts testified that the decedent's life *could* have been prolonged or saved with earlier diagnosis. Applying the traditional analysis, the court noted that, although medical expert testimony "to a reasonable medical certainty" is no longer required, testimony as to mere possibilities will not suffice. *Id.* at 1195. Thus, the court did not need to decide whether to adopt the loss of chance theory because the plaintiff did not show that it was more probable than not that the decedent was deprived of a chance of survival.

In *Jablonski,* 575 N.E.2d 1039, the decedent suffered a fatal heart attack while at work. Paramedics employed by the decedent's employer treated the decedent, but the decedent died before reaching the hospital. The plaintiff alleged that the treatment given to the decedent by the employer's paramedics was negligent and proximately caused his death by depriving him of a "chance of life." In asking the court to apply the loss of chance theory to a worker's compensation case, the plaintiff introduced evidence that over 50% of heart attack patients die before they reach the hospital and that the majority of that number "could, indeed, be taken to the hospital alive" if appropriate critical care had been administered. *Id.* We concluded that even if the court were to adopt the loss of chance theory and apply it to plaintiff's case, plaintiff could not recover because the evidence demonstrated, at best, that the decedent "may have had a slightly less than 50% chance of survival." *Id.* (citing *Watson,* 532 N.E.2d 1191) In *Jablonski,* we did not consider the alternative approaches to the loss of chance doctrine that we consider today.

The loss of chance doctrine is typically traced to *Hicks v. United States* (4th Cir. 1966), 368 F.2d 626 (applying Virginia law). In *Hicks,* the patient was negligently diagnosed as suffering from gastroenteritis and was sent home with pain killers. The patient in fact was suffering from an high intestinal obstruction and died several hours after seeing the physician. The uncontradicted testimony by the plaintiff's experts was that if operated on promptly, the patient would have survived. The defendant argued that even if the patient's condition had been properly diagnosed, it was mere speculation to say that surgery would have been successful. The court stated,

> When a defendant's negligent action or inaction has effectively terminated a per-

---

**2.** This approach is based on § 323 of the *Restatement (Second) of Torts* (1965):

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of harm.

However, because § 323 addresses the issue of duty, not causation, this approach has been criticized. *See, e.g., Sherer v. James* (1986), 290 S.C. 404, 351 S.E.2d 148; *Curry v. Summer* (1985), 136 Ill.App.3d 468, 91 Ill.Dec. 365, 483 N.E.2d 711, *appeal denied* (1986); *see generally* Lisa Perrochet, Sandra J. Smith, and Ugo Colella, *Lost Chance Recovery and the Folly of Expanding Medical Malpractice Liability,* 27 Tort & Ins. L.R. 615 (1992) (hereinafter cited as *Lost Chance*).

son's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. *If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable....* [Our emphasis.] The law does not in the existing circumstances require the plaintiff to show to a *certainty* [emphasis in original] that the patient would have lived had she been hospitalized and operated on promptly. [Citation omitted.]

*Id.* at 632. The court concluded, "Since the uncontradicted testimony was that with prompt surgery she would have survived, the conclusion follows that the dispensary doctor's negligence nullified whatever chance of recovery she might have had and was the proximate cause of the death." *Id.* at 633.[3]

Notwithstanding criticism of the *Hicks* decision, the loss of chance doctrine has been adopted by courts across the country.[4] In *Perez v. Las Vegas Medical Center* (1991), 107 Nev. 1, 805 P.2d 589, the court adopted the rule that "the plaintiff must present evidence tending to show, to a reasonable medical probability, that some negligent act or omission by health care providers reduced a substantial chance of survival given appropriate medical care." *Id.* at 6, 805 P.2d at 592. How high the chance of survival must be in order to be "substantial" is a question of fact to be addressed on a case by case basis. The court recognized that the injury to be redressed is "not defined as the death itself, but, rather, as the decreased chance of survival caused by the medical malpractice." *Id.* at 6, 805 P.2d at 592. The court gave a compelling reason for adopting the loss of chance doctrine: in the absence of the doctrine, recovery in tort on behalf of the survivors of many potentially terminal patients would be barred, no matter how blatant the health care provider's negligence. *Id.* at 5, 805 P.2d at 591.

Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow care providers to evade liability for their negligent actions or inactions in situations in which patients would not necessarily have survived or recovered, but still would have a significant chance of survival or recovery.

*Id.* at 5–6, 805 P.2d at 591 (citing *McKellips v. Saint Francis Hosp., Inc.* (1987), Okla., 741 P.2d 467, 474).

---

3. Many courts and commentators have criticized using *Hicks* as authority for recognizing the loss of chance doctrine. Although the language in *Hicks* suggested recovery for the loss of a *substantial possibility* of survival, the *Hicks* court in fact decided the case under a traditional causation analysis because the facts of that case were such that the plaintiff proved that it was *more probable than not* that the doctor negligently caused decedent's death by misdiagnosing decedent's condition; thus, the substantial possibility language was mere dicta. *See, e.g., Cooper v. Sisters of Charity of Cincinnati* (1971), 27 Ohio St.2d 242, 272 N.E.2d 97; *Lost Chance, supra.*

4. *See, e.g., Murdoch v. Thomas* (1981), Ala., 404 So.2d 580; *Thompson v. Sun City Community Hosp., Inc.* (1984), 141 Ariz. 597, 688 P.2d 605 (following § 323 approach); *Sharp v. Kaiser Foundation Health Plan* (1985), Colo.App., 710 P.2d 1153 (rejecting *Cooper v. Sisters of Charity of Cincinnati* (1971), 27 Ohio St.2d 242, 272 N.E.2d 97, and following § 323 approach), *aff'd* 741 P.2d 714 (1987); *Richmond County Hosp. Authority Operating University Hospital v. Dickerson* (1987), 182 Ga.App. 601, 356 S.E.2d 548; *Northern Trust Co. v. Louis A. Weiss Memorial Hosp.* (1986 1st Dist.), 143 Ill.App.3d 479, 97 Ill.Dec. 524, 493 N.E.2d 6 (rejecting *Cooper,* 272 N.E.2d 97, and following § 323 approach); *but see Russell v. Subbiah* (1986 3rd Dist.), 149 Ill. App.3d 268, 102 Ill.Dec. 516, 500 N.E.2d 138 (traditional proximate cause analysis); *DeBurkarte v. Louvar* (1986), Iowa, 393 N.W.2d 131; *Roberson v. Counselman* (1984), 235 Kan. 1006, 686 P.2d 149 (rejecting *Cooper,* 272 N.E.2d 97); *Bourne v. Seventh Ward General Hospital* (1989), La.App., 546 So.2d 197; *Aasheim v. Humberger* (1985), 215 Mont. 127, 695 P.2d 824 (following § 323 approach but recognizing lost chance as injury); *Wollen v. DePaul Health Center* (1992), Mo., 828 S.W.2d 681 (rejecting *Cooper,* 272 N.E.2d 97); *Perez v. Las Vegas Medical Center* (1991), 107 Nev. 1, 805 P.2d 589 (adopting "pure" loss of chance doctrine); *Scafidi v. Seiler* (1990), 119 N.J. 93, 574 A.2d 398 (rejecting *Cooper,* 272 N.E.2d 97); *Kallenberg v. Beth Israel Hosp.* (1974), 45 App.Div.2d 177, 357 N.Y.S.2d 508, *aff'd* 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128; *McKellips v. Saint Francis Hosp., Inc.* (1987), Okla., 741 P.2d 467 (following § 323 approach); *Herskovits v. Group Health Co-op* (1983), 99 Wash.2d 609, 664 P.2d 474 (following § 323 approach); *Thornton v. CAMC, etc.* (1983), 172 W.Va. 360, 305 S.E.2d 316 (following § 323 approach); *Ehlinger v. Sipes* (1990), 155 Wis.2d 1, 454 N.W.2d 754 (rejecting *Cooper,* 272 N.E.2d 97).

The approach taken by the *Perez* court is in line with the pure loss of chance doctrine expounded by Professor King. The question of causation is a separate and distinct issue from the question of valuation. Thus, as to causation, the traditional reasonable probability test is applied and the plaintiff must demonstrate to a reasonable medical probability that the health care provider decreased the patient's chance, whatever that chance was, of survival or successful treatment. As to valuation, the chance of survival or of successful treatment, no matter how small, is a compensable interest for which the negligent defendant is liable. Damages for the lost chance are measured by the "percentage probability by which the defendant's tortious conduct diminished the likelihood of achieving some more favorable result." *Lost Chance, supra* at 620 (quoting *King, supra* at 1382).

■ We are convinced that the loss of chance doctrine, in its pure form, has a place in medical malpractice actions. We believe that the chance of which the patient has been deprived is worth something, regardless of the fact that the patient ultimately dies. As Professor King notes, if we regard only the death as the compensable injury, the plaintiff faces an all or nothing result, even though the patient has been deprived of *something* due to the defendant's negligence. *King, supra* (recognizing that a lost chance as a compensable injury with value fills the gap in those cases where a plaintiff cannot prove negligence caused the death, but where negligence did cause the patient to lose a chance at avoiding death). We agree with the court in *Perez,* 107 Nev. at 5, 805 P.2d at 591, that it is "simply untenable" to

> bar any recovery in tort on behalf of the survivors of many potentially terminal patients, no matter how blatant the health care provider's negligence. Through negligence, a physician or other health care provider could reduce a patient's chances of survival from as high as fifty percent to, for example, ten percent, and yet remain unanswerable in the law of tort.

Some courts, in rejecting the loss of chance doctrine, have followed the Ohio Supreme Court's lead in *Cooper,* and argue that the doctrine is inconsistent with traditional tort concepts because recovery is allowed upon a showing of a mere *possibility* that the physician's negligence caused the patient's death. *Cooper,* 272 N.E.2d at 103; *see also Dumas v. Cooney* (1991), 235 Cal.App.3d 1593, 1 Cal.Rptr.2d 584, *review denied* (1992); *Fennell v. Southern Maryland Hosp. Center, Inc.* (1990), 320 Md. 776, 580 A.2d 206. This criticism fails to recognize two distinct variations of the loss of chance doctrine.

Under the pure doctrine, which we adopt today, the injury being compensated and for which the plaintiff must show a causal connection is the *decrease* in or the deprivation of the *chance* the patient had for recovery. The plaintiff is not recovering for the value of the death; just for the lost chance of recovery. There will be no compensation if the negligence did not deprive the patient of that chance—for example, in a case where the patient did not have a chance of survival even in the absence of negligence. Under the pure doctrine, the plaintiff is not recovering for a death that does not bear a causal relationship to the negligence.

However, under the § 323 Restatement (Second) of Torts approach, the compensable injury is generally viewed as the death and recovery for the death is allowed in the absence of a causal relationship between the negligence and the death. This—and for the reason that § 323 addresses duty, not causation—is why we reject the § 323 approach and adopt the pure loss of chance doctrine that requires a causal relationship between the negligence and the injury being compensated.

The dissent argues that adopting the loss of chance doctrine will result in erroneous and inequitable outcomes. First, the dissent quotes a statistical analysis presented in *Fennel,* 320 Md. 776, 580 A.2d 206, to argue that the loss of chance doctrine will, on average, result in erroneous awards to plaintiffs. Of course, that same passage acknowledges that the traditional approach also produces erroneous awards to plaintiffs; but, more to the point, "[t]ort law is not about mathematical niceties; it has to do with fairness to fault-free victims who have suffered harm by reason of the tortious acts or omissions of

others." *Id.* at 796, 580 A.2d at 216 (Adkins, J., dissenting).

The dissent argues also that adoption of the loss of chance doctrine will result in escalating malpractice insurance premiums and consumer costs because the number of medical malpractice claims will increase and because physicians will be compelled to practice defensive medicine. Certainly, tort law is as much about influencing conduct by civil sanctions as it is about compensating injured persons. However, nothing in this opinion requires physicians to do anything more in the way of reasonable medical care than is already required. The fact is the medical review panel here found that reasonable medical care was not given. We cannot condone the notion that reasonable medical care is only due those who have a probability of recovery and denied those who have only a substantial chance of recovery.

Finally, the dissent argues that the loss of chance doctrine allows recovery for the mere *possibility* that the physician's negligence was a cause of the death. As we explained above, however, the injury being compensated is the loss of the chance of recovery or a better result, not the death. Of course, recovery for the loss of chance of survival can only occur where the patient dies because a patient who is still living has not lost the chance of survival. But, the doctrine is not only applicable where death occurs. The doctrine is also applicable where the patient, who is still alive but in a worse condition, was deprived of the chance of a better result— not necessarily survival—absent the negligence. Although the loss of chance doctrine in its pure form that we adopt today allows recovery only where the plaintiff proves that the defendant more probably than not injured the plaintiff, we note that our supreme court has allowed recovery where there existed only a *possibility* that defendant's negligence would result in the plaintiff getting meningitis or becoming epileptic. *Dayton Walther Corp. v. Caldwell* (1980), 273 Ind. 191, 402 N.E.2d 1252.

The dissent has identified the arguments embraced by courts who have declined to adopt the loss of chance doctrine. However, to the extent those arguments have merit, we believe that when balanced against the arguments in favor of recognizing the loss of chance doctrine, the balance weighs more heavily in favor of recognition of the doctrine.

*Application of Loss of Chance Doctrine*

■ We now must determine whether Sparkman has made a sufficient showing under the loss of chance doctrine to avoid summary judgment. Under the "pure" loss of chance doctrine that we adopt today, the plaintiff must present evidence tending to show that some negligent act or omission by health care providers deprived the patient of a substantial chance of survival given appropriate medical care. What a "substantial" chance is must be determined on a case by case basis. We emphasize that the injury Sparkman must prove was caused by Mayhue's negligence is the loss of the chance of recovery Norma had. Although Sparkman identifies Norma's death as a compensable injury resulting from Mayhue's negligence, Sparkman cannot recover on his loss of consortium claim for Norma's death because, as we noted above, his evidence does not show that Mayhue more probably than not caused Norma's death.

■ As for the compensable injury identified as Norma's loss of chance of recovery, Sparkman presented expert medical testimony that Norma had a significant chance of resectability (surgical removal of the tumor) in May, 1989. The expert further testified that if the tumor was resectable in May, 1989, Norma would have had at least a 50–50 chance of survival with the surgery. From this evidence, a jury could infer that Norma had a substantial chance of recovery in May, 1989, and that Mayhue's negligence in failing to take steps to detect the tumor at that time deprived Norma of that substantial chance. Thus, in response to Mayhue's motion for summary judgment, Sparkman came forward with evidence showing that there is a genuine issue of material fact on the question of proximate cause. Consequently, the trial court properly denied Mayhue's motion for summary judgment.

We note that by our decision today, Sparkman avoids summary judgment on the issue

whether Mayhue's negligence proximately caused Norma to be deprived of a chance to recover. In order to prevail on his loss of consortium claim, Sparkman must still prove all of the elements of the underlying negligence claim and then prove his loss of consortium caused by that negligence.

AFFIRMED.

SHARPNACK, C.J., concurs.

STATON, J., dissents with opinion.

STATON, Judge, dissenting.

I dissent for the following reasons:

1. Adoption of the lost chance of survival doctrine will yield erroneous awards to plaintiffs.

2. Rather than avoiding apparent inequities, the adoption of the lost chance doctrine will create greater inequities.

3. If the lost chance doctrine is adopted for Indiana, physicians will be the only professional malpractice defendants subjected to liability in the absence of proof that their alleged negligence probably caused the injury.

An example of how the doctrine of lost chance will result in erroneous and inequitable outcomes was provided by the Court of Appeals of Maryland:

Because loss of chance of recovery is based on statistical probabilities, it might be appropriate to examine the statistical probabilities of achieving a 'just' result with loss of chance damages....

To compare the two rules, assume a hypothetical group of 99 cancer patients, each of whom would have had a 33⅓% chance of survival. Each received negligent medical care, and all 99 died. Traditional tort law would deny recovery in all 99 cases because each patient had less than a 50% chance of recovery and the probable cause of death was the pre-existing cancer not the negligence. Statistically, had all 99 received proper treatment, 33 would have lived and 66 would have died; so the traditional rule would have statistically produced 33 errors by denying recovery to all 99.

The loss of chance rule would allow all 99 patients to recover, but each would recover 33⅓% of the normal value of the case. Again, with proper care 33 patients would have survived. Thus, the 33 patients who statistically would have survived with proper care would receive only one-third of the appropriate recovery, while the 66 patients who died as a result of the pre-existing condition, not the negligence, would be overcompensated by one-third. The loss of chance rule would have produced errors in all 99 cases.

*Fennell v. Southern Maryland Hospital* (1990), 320 Md. 776, 580 A.2d 206, 212–13 (declining to adopt the doctrine of loss of chance of survival).

A second inequitable outcome resulting from the adoption of this doctrine is that physicians will be the only professional malpractice defendants subjected to liability in the absence of proof that their alleged negligence probably caused the injury. *See Gooding v. University Hosp. Bldg., Inc.* (1984), Fla., 445 So.2d 1015, 1020. The number of medical malpractice claims consequently will increase, thereby escalating malpractice insurance premiums and consumer costs. Also contributing to the increased cost of medical care will be the unnecessary treatment and testing inevitably performed when physicians are compelled to practice medicine defensively. Defensive medicine does not cure; it kills the availability of medical treatment for others. It is unreasonably expensive.

Lastly, today's holding threatens to erode traditional principles of tort law in ways other than those which are readily apparent:

[I]f a doctor negligently treats a person with a 40% chance of recovery and the doctor's negligence reduces the patient's chance of recovery to only 10%, whether the patient lives or dies, the doctor's negligence cost the patient a 30% loss of chance of survival. If the patient dies, the probable cause of death was the pre-existing disease or injury; it is unlikely that the negligence caused the death. If the patient lives, the negligence clearly did not cause the death. In both scenarios, there was negligence resulting in a 30% loss of chance of survival. If courts are going to

allow damages solely for the loss of chance of survival, logically there ought to be recovery for loss of chance regardless of whether the patient succumbs to the unrelated pre-existing medical problem or miraculously recovers despite the negligence and unfavorable odds.

Since loss of chance damages are only permitted when the patient dies, it is also arguable that, when we strip away the rhetoric, damages are really being awarded for the *possibility* that the negligence was a cause of the death.

*Fennell, supra,* 580 A.2d at 213. Mere possibilities are insufficient to support an award of damages under Indiana law. *Watson v. Medical Emergency Services* (1989), Ind. App., 532 N.E.2d 1191, 1195, *reh. denied, trans. denied.*

Because it is undisputed that Norma Sparkman would have probably died even in the absence of negligence, I would reverse and instruct the trial court to grant Dr. Mayhue's motion for summary judgment.